16691

STATE v. THOMAS *ET AL.*

(73 S. E. (2d) 722)

*Messrs. Thompson & Poteat,* of Georgetown, *for Appellant, Margaret Gertrude Vernon,*

*Mr. J. Reuben Long,* of Conway, *Solicitor, for Respondent,*

December 10, 1952.

BAKER, Chief Justice.

The defendant-appellant, Margaret Gertrude Vernon, and her co-defendant, Herbert Thomas, both of the white race, were tried at the November term, 1951, of the Court of General Sessions in and for Georgetown County, on an indictment charging them with the murder of Freddie Mitchell, a Negro man, on the 18th day of August, 1951. The jury found both of the defendants guilty of manslaughter, whereupon, the Presiding Judge sentenced the defendant-appellant, Margaret Gertrude Vernon, to be confined at hard labor for a period of 20 years in the County Jail of Georgetown County or for a like period in the State Penitentiary; and the defendant Herbert Thomas to be confined at hard labor for a period of 20 years upon the Public Works of Georgetown County or for a like period in the State Penitentiary.

While a joint notice of appeal to this Court was served, and joint exceptions were timely served, the only printed brief filed was in behalf of Margaret Gertrude Vernon, and upon oral argument the Court was informed and advised that the defendant, Herbert Thomas, had abandoned his appeal. Therefore, when hereinafter we refer to the appel-

lant, such reference will relate solely to the defendant Vernon.

At the conclusion of the testimony in behalf of the State, and again at the conclusion of all of the testimony in the case, appellant moved for a direction of verdict of not guilty on the ground that "the State has failed to prove the *corpus delicti,* without excluding confessions and admissions. The State has proved that there has been a death, the death of a Negro, identified as one Freddie Mitchell, but they failed to prove by anything other than confessions and admissions that there was a felonious death to sustain any action for either murder or manslaughter." Both motions were refused, and this appeal followed.

The sole question in this appeal is whether there is sufficient evidence, *aliunde* the extrajudicial confessions, to prove the *corpus delicti.*

We quote from *State v. Thomas,* 159 S. C. 76, 156 S. E. 169, 170:

" 'The *corpus delicti,* in a case of murder, consists of two elements,—the death of a human being, and the criminal act of another in causing that death' (*State v. Martin,* 47 S. C. 67, 25 S. E. 113, 115) ; and, in order to authorize a conviction, the state must prove these elements beyond a reasonable doubt, which may be done by circumstantial evidence (*State v. Gillis,* 73 S. C. 318, 53 S. E. 487, 5 L. R. A., N. S., 571, 114 Am. St. Rep. 95, 6 Ann. Cas. 993)."

As hereinabove stated, and copy-modeling from the opinion in *State v. Blocker,* 205 S. C. 303, 31 S. E. (2d) 908, the sole question raised on this appeal is whether there was any evidence apart from the confessions, reasonably tending to establish the *corpus delicti* so as to warrant the admission in evidence of the alleged confessions. The *corpus delicti* includes not only the fact of the death of a person, but it must also appear that such person's death was the result of the criminal act of another person and is not the result of a natural or accidental cause. This rule with

regard to the proof of the *corpus delicti,* apart from the mere confession of the accused, proceeds upon the theory that the general fact, without which there could be no guilt in the accused or in anyone else, must be established before anyone could be convicted of the alleged criminal act which caused it; for otherwise, the accused might be convicted when there was no criminal agency involved.

We quote from *State v. Brown,* 205 S. C. 514, 520, 32 S. E. (2d) 825, 827:

"The general rule is that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury. *State v. Roddey,* 126 S. C. 499, 120 S. E. 359; *State v. Villepigue,* 127 S. C. 392, 121 S. E. 258; *State v. Walker,* 138 S. C. 293, 136 S. E. 215.

"The office and function of the Court when considering a motion for a directed verdict in favor of the defendant, is, not to pass upon the weight of the evidence, but to determine its sufficiency to support the verdict. Where there is any evidence, however slight, on which the jury may justifiably find the existence or the non-existence of material facts in issue, or if the evidence is of such character that different conclusions as to such facts reasonably may be drawn therefrom, the issues should be submitted to the jury. *State v. Prince,* 165 S. C. 115, 162 S. E. 777; *State v. Gellis,* 158 S. C. 471, 155 S. E. 849; *State v. Rush,* 129 S. C. 43, 123 S. E. 765."

We again quote, and from *State v. Epps,* 209 S. C. 246, 251, 39 S. E. (2d) 769, 770:

"In proving *corpus delicti,* the law demands the best proof which in the nature of the case is attainable. Direct and positive evidence is not essential. It is now well established that the elements constituting the *corpus delicti* in a homicide case—the death of the person whose life is alleged to have

been taken feloniously, and the criminal agency of another in taking the life of such person—may be sufficiently proved by presumptive or circumstantial evidence, where that is the best evidence obtainable. *State v. Thomas,* 159 S. C. 76, 156 S. E. 169; *State v. Gillis,* 73 S. C. 318, 53 S. E. 487, 5 L. R. A., N. S., 571, 114 Am. St. Rep. 95, 6 Ann. Cas. 993."

It is admitted by the appellant that the first element of the *corpus delicti,* that is, the fact of the death of Freddie Mitchell, has been sufficiently proved by the State. It is, however, appellant's contention that the State has failed to legally or sufficiently prove the second element, that is that the death of said Mitchell was brought about through the criminal agency of another.

The last time Mitchell's wife saw the deceased was on Saturday, August 18, 1951, at about 12 o'clock. At between 12:30 and 1 o'clock that afternoon the deceased was at a fishing camp at Myrtle Grove, on White Creek, occupied by Herbert Thomas and the appellant, where they were living together as man and wife, although the appellant had a living husband, from whom she had not been divorced, and for this reason they had never entered into a marriage ceremony. At that time, Dempsey Thomas, the brother of Herbert Thomas, was also at this fishing camp, and the deceased had a one-half pint bottle of whiskey which was consumed by the four of them. The appellant asked Mitchell to loan her either fifty cents or seventy-five cents, which he agreed to do, stating, however, that it was necessary for him to get some money changed in order to comply with the request, and thereupon the two Thomas men and Mitchell went to Georgetown, stopping at some house about the edge of the city limits, where Mitchell bought some more whiskey (illegal whiskey), and gave to Herbert Thomas the money he was to lend to appellant. They parted company near there, which point was about one mile from the fishing camp above referred to. The two Thomas men continued on into Georgetown, and to a place of business estimated to be about two miles from the fishing camp, where Herbert Thomas, the

co-defendant of the appellant, with the money that Mitchell had given him for the appellant, as a loan to her, purchased some bay rum to be used as a beverage.

Upon the return of Herbert Thomas to the fishing camp within a short space of time, he found that the deceased had already returned there ahead of him, and was then there. While this fact is learned from the alleged confession of said Herbert Thomas, and his testimony when being tried, yet it will be noted that such fact alone merely fixes the time when and place where the deceased was last seen alive in so far as the record discloses.

Mitchell's disappearance was reported by his wife on Monday, August 20, 1951, and on August 23, 1951, his body was found floating "right in the mouth of Pennyroyal Creek that makes out from Sampit River in this County."

White Creek goes off of Sampit River, and it is not contended that the body of the deceased would not have floated or been carried by the tide from White Creek to where it was found in Pennyroyal Creek. When the body was found, it was badly decomposed, and to the extent it was at first thought to be that of a white man. However, it was later determined that the body was that of a Negro man, and identification was made through the trousers and belt holding them on the body.

Following the burial of Mitchell, and under an order of a Circuit Judge, his body was disinterred for the purpose of performing an autopsy thereon. The autopsy was made on August 31, 1951, in the autopsy room of Roper Hospital, Charleston, S. C., by Dr. E. E. McGee, a practicing physician, and the Pathologist at the Medical College of South Carolina.

We quote from Dr. McGee's testimony on direct examination:

"The next group of findings were related to the bones of the face and remaining soft tissue over the scalp. As I mentioned before the soft tissues over the face, most parts were

almost completely absent. Likewise, the bones comprising the lower jaw, the right lower jaw was absent, the middle half of the left lower jaw was missing, there remaining only this portion of the lower jaw (indicating on his face). It was attached to the face, and in it we found four teeth. The upper jaw, designated as the Maxilla, and running in this area here (indicating) was fragmented, and this portion of the middle half of the right upper cheek were missing and fragments were found attached by cord strands to the rest of the facial bones. That portion of the right upper jaw that comes up alongside of the nose was missing, as well as the floor of the orbit or cavity where the eye is situated. On the left side there was a similar fracture or similar loss of substance of the middle portion of the left upper jaw, with a defect a little over half inch in diameter, running in the same direction as and about the length of the nose. The defects were all that could be identified with any degree of surety. There were other fragments of bones, pieces of bony material lying over the surface of the facial bones, some of which were attached and some were not. The structure or texture of the bones led us to believe they were parts of the sinus bones. The only other finding of note was the area of spending over the posterior portion of the skull on the left side in about this general area here (indicating on head). In an area of roughly two centimeters, the remaining soft tissue was more especially spent than any portion.

"The Court: How much is two centimeters?

"Witness: 2½ centimeters make up an inch. I mean to say roughly 2 x 3 inches, over this area of the skull here (indicating on head). One other thing that might be added, there was a bit of skin over the back of the neck which was deeply pigmented, which, from my examination, as far as I am concerned, I am satisfied that this body was that of a negro. Microscopic examinations were performed of the soft tissue overlying the skull, and from this examination we found remnants or bits of what we concluded to be blood pigment, and it was my impression that this was evidence

in favor of an old hemorrhage or blood on the surface of the skull. The body cavities were opened, the skull was opened and the chest opened and the abdonmen was opened, and all of those tissues were so decomposed that I could not identify any specifically either with the naked eye or the microscope. One thing that was noted was that, although the contents of the skull were some liquid in character, there was no pigmentation that one would expect to see if there had been a hemorrhage or bleeding within the skull. The findings I thought of value were alterations of the structure of the facial bones, pigment of the tissues over the skull.

"Q. What in your opinion caused this man's death? A. I don't know that I could rightly give a cause of death. I could say that the bony structures of the face were subjected to some kind of forces.

"Q. Did you find any wounds on the head that were sufficient to cause death? A. A blow causing such damage to these bones would be sufficient to cause death.

"Q. If a blow was inflicted which caused that particular wound, would you say in your opinion that caused the death or was a contributing cause? A. Yes, sir."

On cross-examination, Dr. McGee testified that the lungs were in such a condition that he could not tell whether death was caused from drowning, nor would he say what caused the death of the deceased, but was very definite in testifying that the body was that of a Negro.

The record discloses that in the waters through which this body passed or floated between White Creek and the "mouth of Pennyroyal Creek that makes out from Sampit River," there are usually a great number of logs, and from this fact, it is suggested that the crushing of the facial bones as testified to by Dr. McGee could have been caused by the body of the deceased coming into contact with such logs, or being caught between floating logs, but such explanation is of course highly conjectural.

It is sometimes difficult, where the criminal agency ▉▉ of another is sought to be proved by circumstantial evidence, but on a motion for a direction of verdict of not guilty, the evidence must be viewed in the light most favorable to the State's cause. Viewing the evidence in such light, and after careful consideration of the record, we are of opinion that there was sufficient evidence of the second element of the *corpus delicti,* that is, that the deceased met his death as the result of the criminal act of another, to warrant the trial Judge in submitting such issue to the jury, and in admitting in evidence the alleged confessions in the case.

The judgment of guilty, and sentence imposed is affirmed.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.