17793

**STATE, Respondent, v. George McIVER, Appellant**
(120 S. E. (2d) 893)

*Elliott D. Turnage, Esq.,* of Darlington, *for Appellant,*

*Robert L. Kilgo, Esq., Solicitor,* of Darlington, *for Respondent,*

June 1, 1961.

LEGGE, Justice.

At the January, 1961, term of the Court of General Sessions for Darlington County, the defendant George McIver was tried for murder of Dorothy Mae (also known as Tootsie) Brown. Convicted of manslaughter and sentenced to serve ten years, he appeals on numerous exceptions charging error on the part of the trial judge: (1) in admitting certain testimony; and (2) in denying his motions for directed verdict and for new trial.

Following is a summary of the testimony for the state:

*Howard Godbold:* Witness, a patrolman of the Darlington Police Department, went at about 6:15 a. m. on October 22, 1960, to No. 364 Edwards Avenue to investigate a reported shooting. Several persons were standing outside of the house, among them the defendant, who was near the door. In response to the officer's inquiry as to who was hurt, the defendant said: "Get me an ambulance. I'm hurt;" and, turning, walked into the house. Godbold followed, and, as they entered the bedroom, asked: "Where are you hurt?" Defendant replied: "I shot Tootsie." Godbold asked where she was, and defendant pointed to the bed. She was lying

on the bed, with the covering over her. Godbold pulled the covering back and found that she was dead, her body still warm. Blood was seen on her gown and on the bed, but not elsewhere. After calling police headquarters, the witness returned to the bedroom and asked the defendant where the gun was. It was on the dresser; the defendant picked it up and said: "This is it." The gun, a .22 caliber pistol, had in it five cartridges, of which one had been fired. Defendant then said that he had been in the bed asleep, and that when he awoke "she had the gun cocked on him and when he hit her hand it went off." The witness testified, further, that when the defendant was brought to the police station he said that when he awoke the deceased was kneeling beside the bed and "had the gun on him" and that he hit her hand.

*N. G. Dudley:* Witness, a lieutenant of the Darlington Police Department, had received report of the shooting about 6:15 a. m. and had sent patrolman Godbold to investigate. Upon Godbold's calling back, Dudley went to the house, where he found defendant talking to Godbold in the bedroom. The house consisted of two stories, with two apartments on each floor. Defendant's apartment was on the lower floor and was separated by a very thin partition from the adjoining apartment, which was occupied by Louise Stokes and her husband, Willie Stokes. Officer Dudley testified that he asked the defendant what had happened, and that at that time, in his apartment, the defendant stated that he and the deceased had been playing in the bed and the gun "went off"; but that later, at the police station, he said that she had waked him up, that she was kneeling on the side of the bed with the gun pointed at him and told him she was going to shoot him; and that he had, with his hand, struck the gun or her hand and the gun "went off". The witness further testified that the gun, which had been admitted in evidence without objection, would not hold the hammer back in a cocked position, and could be fired, ordinarily, only by pulling the trigger.

*Dr. William Early:* Following a call from patrolman God-
bold about 6:15 a. m. on October 22, witness went to No.
364 Edwards Avenue and examined the body of the de-
ceased, which was lying on the bed. There was a puncture
wound in the left chest about two inches to the inside of,
and two inches above, the left nipple. Next day he opened
the chest and traced the bullet, finding that it had entered at a
slight angle upward and had gone through a portion of the
lung and into the heart. He was unable to say from his ex-
amination whether the injury had been inflicted by the de-
ceased or by some other person.

*Louise Stokes:* The defendant had moved in the summer
of 1960 into the apartment adjoining that in which the wit-
ness and her husband lived. Dorothy Mae Brown had been in
the defendant's apartment for about three weeks prior to the
shooting. On the morning of October 22, 1960, witness got
up around six o'clock to prepare breakfast, and heard the
defendant say to Dorothy Mae Brown that if she "did it"
he would shoot her. Two or three minutes later witness
heard a shot and then heard the defendant say: "Somebody
get the doctor or the ambulance." Witness went across the
street and called the police. She did not go into the defend-
ant's apartment, and never had any converation with him
about what had happened. She recognized the voices of the
defendant and the deceased. On cross-examination, she stated
that on the night before the shooting Dorothy Mae was in
the defendant's apartment when the witness came home from
work; that she did not know at what time the defendant came
in; that Dorothy Mae was not a good friend of the witness;
that she did not know whether or not Dorothy Mae was
drinking that night; and that although she heard voices in
the defendant's apartment she did not hear what words were
spoken except as before stated.

*Allen Willoughby:* This witness, a thirteen-year-old boy
who lived in the apartment above that of the defendant, testi-
fied that on the morning in question he heard the defendant

say: "Oh, Lord, call the doctor, ambulance, anybody. I shot Tootsie." He had heard no shot. He dressed and went downstairs to the defendant's apartment, where he saw the deceased on the bed and the defendant crying and saying over and over: "I shot Tootsie."

Exceptions 1, 2 and 3, below summarized, will be considered together. They charge that the trial judge committed error:

Exception 1. "In admitting the testimony of the state's witnesses tending to establish an extra-judicial admission of the defendant: because the state did not, by evidence aliunde said admission, establish the corpus delicti."

Exception 2. In refusing defendant's motion for directed verdict: because at that stage of the trial there was no proof of the corpus delicti other than that afforded by the defendant's admission.

Exception 3. In refusing defendant's motion for new trial: because, except for his admissions, the evidence of his guilt was circumstantial and insufficient to point to his guilt to the exclusion of any other reasonable hypothesis.

These exceptions cannot be sustained. For support of the first and second, appellant invokes the well-established rule that a conviction cannot be had on the extra-judicial confessions of the defendant uncorroborated by proof aliunde of the corpus delicti. *State v. Blocker,* 205 S. C. 303, 31 S. E. (2d) 908; *State v. Teal,* 225 S. C. 472, 82 S. E. (2d) 787. In a homicide case, the corpus delicti consists of two elements,— the death of the person killed, and its causation by the criminal act of another. These elements may be sufficiently proven by circumstantial evidence where, as is often the case, that is the best evidence obtainable. *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769; *State v. Thomas,* 222 S. C. 484, 73 S. E. (2d) 722. Here, the first element was directly proven; and in our opinion the evidence for the state was, entirely apart from the defendant's admis-

sions, quite sufficient to carry to the jury the issue of criminal agency.

It was not for the trial judge, as the third exception ▮ suggests, to weigh the evidence or to evaluate the credibility of the witnesses. Where circumstantial evidence is relied upon by the state in a criminal case, there must be positive proof of facts and circumstances which, taken together, warrant inference of guilt to a moral certainty, to the exclusion of any other reasonable hypothesis. *State v. Kimbrell,* 191 S. C. 238, 4 S. E. (2d) 121. But if there is any evidence tending to support such inference, it is the duty of the trial judge to submit the issue to the jury. *State v. Edwards,* 173 S. C. 161, 175 S. E. 277. We think that he properly did so in the instant case.

Error in refusal of defendant's motion for new trial is charged in two other exceptions:

Exception 4. "because the uncontradicted testimony of the defendant, and his alleged extra-judicial admissions, completely refuted any hypothesis of the decedent's death being caused by the wrongful or guilty act of the defendant."

Exception 10: "because the testimony, even if defendant's uncontradicted version as to the cause of death of the decedent was not believed by the jury to be true, presented the jury with the necessity of deciding the guilt or innocence of the defendant upon purely circumstantial evidence from which several reasonable inferences could be drawn, and not pointing with exclusive certainty to the conclusion that the death of the decedent was caused by the wrongful or guilty act of the defendant."

The defendant testified as follows:

He is a truck driver, forty-eight years of age, a lifelong resident of Darlington. On Friday, October 21, 1960, he hauled a load of tobacco from Danville, Va., to Winston-Salem, N. C., and then came on to Darlington. Dorothy Mae Brown was traveling with him, as she had been doing for

about three years. They arrived in Darlington at around 3:30 that afternoon, and he left Dorothy at his home, with a pint of whiskey that he had purchased, and drove to his employer's place of business in Camden, S. C., where he was directed to go to St. Matthews and deliver the trailer to his employer, Mr. Hickman. He left St. Matthews about 7:00 p. m. in the truck, minus trailer, and reached his home in Darlington about 9:30 that evening. Dorothy was there, and had cooked supper. They had a drink of whiskey, ate supper, watched television for a while, and then went to bed. Dorothy wouldn't believe that he had gone to St. Matthews, and she accused him of having been out with another woman; but they had no further argument, and went to sleep, the pistol being "up in the head of the bed", where it was always kept. To quote from his testimony at this point:

"Well, we went to sleep. The next morning, we woke up and she was straddle me and so she said: 'I'm going to kill you, George, because you didn't tell me the truth about where you been last night.' I say, 'No', I say—just passing off talk, me and her just talking. And so she had the pistol right down like that (indicating downward) and I opened my eyes and I was laying back on my back and I looked down the barrel, so I just say, 'Oh, go on.' She say, 'I'm going to kill you. Don't say another word', and I hit her hand like that; hit her hand with my left hand; hit her hand and the pistol fired and went off and killed her."

He denied that he had pulled the trigger, and denied that he had said (as Louise Stokes testified) that he would shoot her if she did something again. He admitted having stated to the police officer that he had shot Dorothy, meaning that the shooting had taken place as stated in his testimony just quoted.

On cross-examination he admitted: that he did not explain the manner of the shooting until he had been taken to police headquarters; that prior to October 21 Dorothy had accused him of going with another woman; and that the pistol that

had caused her death could not be discharged except by pulling the trigger.

What has been said in discussion of Exceptions 1, 2 and 3 is equally applicable to, and similarly disposes of, Exceptions 4 and 10. Since the two last mentioned refer to the testimony of the defendant, we have summarized it above. His version of the shooting was exculpatory rather than confessional; but in the light of the testimony of Louise Stokes it cannot be called uncontradicted. It confirmed the testimony of Officer Dudley that the hammer of the pistol would not stay in the cocked position. That fact, Louise's testimony, the defendant's conflicting accounts as to the position of the deceased immediately before the fatal shot, the undisputed testimony of Dr. Early as to the location of the wound and the range of the bullet,—these were all matters for the jury to consider in determining whether or not to believe the defendant's statement that the striking of her hand by his caused the deceased to shoot herself.

Exceptions 5, 6, 7, 8 and 9 charge: that the solicitor improperly argued to the jury that the defendant changed his account of the shooting after he had been taken to the police station, and that when the shooting occurred the defendant "had the murder gun in his hand"; and that the solicitor improperly attempted to demonstrate to the jury, with the pistol that the deceased could not have pulled the trigger and shot herself in the manner testified to by the defendant. In each of these exceptions it is charged that because the trial judge had absented himself from the court room during most of the solicitor's argument, defendant's counsel was unable to make timely objection to the alleged improper conduct of the solicitor.

We preface our discussion of these exceptions by saying that in our opinion a trial judge should not absent himself from the court room during any part of a trial. The practice has grown to be all too common in recent years; and we take this opportunity to express our disap-

proval of it. Not only does it detract from the dignity of the proceedings; the presiding judge is the umpire of the contest, and litigants, their counsel, and the members of the jury are entitled to his presence throughout its course. He has it in his power to order recess whenever he desires one; if he wishes a break in the proceedings he should obtain it by that means.

We find the exceptions under discussion without merit, for three reasons:

1. The portions of the solicitor's argument complained of do not appear to have been improper. There was evidence that the defendant's statement after he had been taken to the police station differed from that made by him to Patrolman Godbold at the scene of the shooting, and also from that made to Lieutenant Dudley upon the latter's appearance at the scene. There was evidence too, including the testimony of Louise Stokes, tending to support the inference that the shooting had not occurred in the manner testified to by the defendant, and that he, not the deceased, had fired the fatal shot. Nor do we find any impropriety on the part of the solicitor in demonstrating that the pistol, which was in evidence, had such a heavy trigger as to make it unlikely that the deceased, a woman, holding it in the position testified to by the defendant, could have fired it into her body at the place where the wound was found.

2. The contentions sought to be made here were made for the first time on the motion for new trial; and in his order denying that motion the trial judge states that although he was not on the bench during the main portion of defense counsel's argument, he was within hearing of the entire argument by the solicitor and was on the bench during those portions of it concerning which the defendant now complains. This statement by the trial judge is conclusive of that factual issue. *Brown v. Hill,* 228 S. C. 34, 88 S. E. (2d) 838.

3. Even if the trial judge had been absent from the court room at the time of the alleged improper argument and conduct on the part of the solicitor, objection should have been made upon his return to the bench and before his charge to the jury, so that he might have either declared a mistrial or called the jury's attention to such portions of the argument, and to such conduct, as he found improper, and instructed the jury to disregard it. Defendant's objection, made for the first time on his motion for new trial, came too late. *Brown v. Singletary,* 226 S. C. 482, 85 S. E. (2d) 738.

Affirmed.

TAYLOR, C. J., and OXNER, Moss and LEWIS, JJ., concur.