## 19713

The STATE, Respondent, v. Dozier GERALD, Appellant.

(200 S. E. (2d) 243)

*Messrs. Raymond Pridgen* and *James C. Hooks, Jr.,* of Mullins, *for Appellant,* cite:

*Messrs. Daniel R. McLeod, Atty. Gen.,* and *Emmet H. Clair, Robert M. Ariail, Asst. Attys. Gen.,* of Columbia, and *T. Kenneth Summerford, Sol.,* of Florence, *for Respondent,* cite:

October 31, 1973.

Moss, Chief Justice:

Dozier Gerald, the appellant herein, was indicted by the Grand Jury of Marion County at the 1972 October Term of the Court of General Sessions charging him with the murder of one Laverne H. Cade. He was tried and convicted at this same term of court and was sentenced to life imprisonment.

At the conclusion of the testimony offered by the State, and upon the close of all of the testimony the appellant moved for a directed verdict of not guilty. After the rendition of the verdict, motion was made for judgment *non obstante veredicto,* and in the alternative for a new trial. All of these motions were refused and this appeal followed.

In order to prove the guilt of the appellant, the State relied wholly upon circumstantial evidence, and one of the questions raised by this appeal is whether the evidence adduced at the trial meets the requirement of law as to the sufficiency thereof to support the conviction. The other question for determination is whether the State is required to prove motive where it relies upon circumstantial evidence for a conviction.

We dispose of the second question first. The trial judge instructed the jury that it was necessary for the State to prove motive in this case. This question is not properly before us for consideration, because the appellant did not raise any objection to this instruction at the trial, although full opportunity was afforded him under Section 17-513.1 of the Code. The failure of the appellant to object or to request an additional charge, when opportunity was afforded constituted a waiver of any right to complain on appeal of the alleged error in the charge. *State v. Richardson,* 253 S. C. 468, 171 S. E. (2d) 717.

The only other question presented for decision is whether the trial judge erred in refusing to grant the motion of the appellant for a directed verdict on the ground that the evidence was insufficient to support the verdict of guilty.

In *State v. Wheeler,* 259 S. C. 571, 193 S. E. (2d) 515, we said:

"In deciding whether the court erred in not directing a verdict in favor of the appellants, we must view the testimony in the light most favorable to the State. When a motion for a directed verdict is made, the trial judge is concerned with the existence or nonexistence of evidence, not with its weight, and although he should not refuse to grant the motion where the evidence merely raises a suspicion that the accused is guilty, it is his duty to submit the case to the jury if there is evidence, either direct or circumstantial, which reasonably tends to prove the guilt of the accused or from which guilt may be fairly and logically deduced. *State v. Jordan,* 255 S. C. 86, 177 S. E. (2d) 464.

"Where circumstantial evidence is relied upon by the State in a criminal case, there must be positive proof of facts and circumstances which taken together, warrant inference of guilt to a moral certainty, to the exclusion of any other reasonable hypothesis. If there is any evidence tending to support an inference of guilt, the court must submit the issue to the jury. *State v. McIver,* 238 S. C. 401, 120 S. E. (2d) 393."

When the evidence is susceptible of more than one reasonable inference, questions of fact must be submitted to the jury. Among other considerations is the credibility of the witnesses, including that of the appellant himself. *State v. Vanderhorst,* 257 S. C. 114, 184 S. E. (2d) 540.

Laverne H. Cade was a taxi driver for the Yellow Cab Company in Florence, South Carolina. The dispatcher for this cab company testified that a call was received on Sunday, June 11, 1972, for a cab to pick up a passenger at 100 Linda Drive in the city of Florence. The cab was dispatched for this purpose at 8:42 P. M., and the driver was the one above named. After the pick up was made, the cab driver reported by radio that he was carrying the passenger to Marion, South Carolina.

Robert Lee Butler testified that he operates a grocery store and market located east of Mullins on Highway 76. He said that some time after 9 o'clock on June 11, 1972, Dozier Gerald was in his store, and at that time he saw a Yellow Cab out in the yard of the store but did not recognize the driver.

Susie Collins testified that she was at her father's home about two miles east of the town of Mullins and at about 9:45 P. M. on the night of June 11, 1972, she heard five shots coming from the direction of a tobacco pack house which was a short distance from where she lived. She testified that immediately after she heard the shots a taxi cab went by her house with a yellow taxi light on the top of the car. She said she was unable to determine how many people were in the taxi when it passed. She testified that she heard two shots and a little later she heard three more shots. She further testified that after she heard the shots, her brother called the officers.

Bruce Rogers, a deputy sheriff for Marion County, as a result of a telephone call, went to the Collins home which was located approximately two miles east of Mullins on a

dirt road some 400 or 500 yards from Highway 76. This officer testified that when he arrived at the Collins home he found the dead body of a man lying in the middle of the dirt road. He identified the body as being that of Laverne H. Cade from a picture on his driver's license taken from his pocketbook. This witness testified that he found a set of tracks that went by the Collins house to a pack house on the left side of the road, which was about 100 yards from the Collins house, and turned to the left on a dirt road and then backed into the same road which leads to Highway 76. This witness testified that he found a fresh set of tracks which went around Cade's body to the right as it lay in the road. One track was almost in the center and the other was almost in the ditch. This officer made a plaster paris mould of the car tracks he found in the road near the body. The next morning this officer found a yellow cab partially in the ditch of a dirt road in the same area a distance across the field from the body of one-fourth to one-half mile or about a mile to a mile and one-half by road. He said that he found blood on the inside of the car and on the fender. The taxi light on the top of the taxi cab had four holes shot in it. This officer, by the test he made identified the tire tracks found where the body was as having been made by the tires that he found on the cab. He also testified that he found some parts of the light from the top of the taxi near the home of one Beck Bethea, and this was approximately one and one-half miles from where he found the body of the deceased.

Beck Bethea testified that she lived outside of the city limits of Mullins and toward the town of Nichols. She said that about 10 o'clock P. M. on the night of June 11, 1972, she saw a yellow taxi automobile that came up a dirt road out in front of her house near her mailbox where it stopped. She said she saw the car lights shining and observed a taxi driver, and he was a white man and was "by hisself." She said she didn't see anyone else except this white man, and she testified that this white man shot twice, and she saw the light on the top of the taxi go out. She further testified

that one of the officers picked up a part of the taxi light in the woods near her mailbox.

The body of Laverne H. Cade was examined by Dr. Hugh V. Coleman, who testified that death resulted from gunshot wound. He testified that there were five wounds of entry, one being in the mid portion of the lower lip with an exit on the jaw, and the direction of this bullet was "sort of face on." He said there was another bullet wound on the mid portion of the right arm indicating a lateral direction. He testified that the three other points of entry were apparently direct from the back. He said there were powder burns on the body of the deceased which indicated that the shots were all fired from close range. This witness removed a bullet from the body of the deceased and delivered it to the sheriff of Marion County.

The sheriff of Marion County testified that he received a bullet from Dr. Coleman and delivered it to Lt. M. N. Cate, a ballistics expert with the South Carolina Law Enforcement Division in Columbia, South Carolina, for examination.

Lt. M. N. Cate testified that he received a bullet from the sheriff of Marion County and made an examination thereof. He found that it was a .32 caliber short and could have been fired from any one of several makes of pistols, including a Rossy.

Mrs. Ruth Epstein who operated a department store in Mullins, South Carolina, testified that she sold the appellant, whom she identified in court, a .32 caliber Rossy pistol on May 21, 1972.

Jim Anderson, an agent of the South Carolina Law Enforcement Division, testified that he interviewed the appellant in the Marion County Jail on June 22, 1972. The appellant made an exculpatory statement to this agent in which he denied shooting the deceased but admitted that he was present when Cade was shot and killed by a colored man who had forced his way into the cab. We will not here summarize

the lengthy statement given to Anderson by the appellant. The appellant testified in his own behalf and this was substantially the same as the statement that he had given to Anderson.

The appellant testified that Laverne H. Cade, a taxi driver whom he did not know and had never seen before, drove him in a Yellow Cab from Florence to Mullins on the night of June 11, 1972; that he stopped at Butler's store and purchased a package of cigarettes with the cab waiting outside the store; that after leaving the store the taxi continued down Highway 76 and just as the cab passed Toney's Station a siren blew; that the taxi pulled over on the shoulder of the road and stopped; that while so stopped, two colored men approached the cab from the rear, one of them coming up on each side of the taxi; that he was riding in the front seat of the cab with the taxi driver and the colored man on his side snatched the door of the cab open, flashed a gun in the car and said "move over"; that he moved over and this man got in the cab beside him; that the man on the driver's side, standing on the outside of the taxi, told the driver "all right, give him the stuff" and "we know what you've got—we know every place you have been" and "it's under the seat, or wherever it is"; that the taxi driver pulled a package of something out of his pocket and handed it to this man and then ran his hand in his front pocket and pulled out something and handed it to him; that the colored man on the outside said to the one on the inside of the cab "you know the place, and what time"; that the taxi driver was told to drive off and that at that time the man on the outside of the car left; that the colored man inside the car directed the taxi driver to turn left off of Highway 76 onto a dirt road; that the taxi driver turned off onto this dirt road and after traveling a short distance passed a house on the right and as they approached a pack house located on the left beyond the house, the man with the gun told the taxi driver to "turn around" which he did by pulling to the left past the pack house and then backing into the road and

facing the same way that they had come; that the taxi driver was told to stop and "get out and come around", to which the taxi driver replied "no, I don't know where I am at, don't leave me down here, you have got what you want and looks like you would be satisfied."

At this point, the appellant testified that the colored man started shooting and continued as the taxi driver attempted to get out of the cab. As the appellant attempted to follow the taxi driver out of the cab, the colored man told him to "hold it, if you get out I'll kill you." The appellant testified that after the first shot was fired, he "lent over" towards the front of the cab. Following the shooting the appellant said that the colored man ordered him to, drive off, and while so doing, he turned out around the taxi driver, who was lying in the road ahead of the cab, so as not to run over him.

After leaving the place of the shooting the appellant drove the cab as directed by the colored man until it was finally stopped in front of the home of Beck Bethea. Here, the appellant was directed to cut off the switch of the cab and get out and to open his billfold and lay his money on the seat of the cab. At this place he said the colored man shot his pistol several times and, according to the testimony of the witness Anderson, the appellant said that the colored man shot four or five holes through the taxi sign on the top of the cab, but since this did not extinguish the light, that he was then ordered to "outen that light" which he did by breaking the bulb.

The appellant testified that after the incident in front of Beck Bethea's home he was directed by the colored man to drive to Highway 76 and to turn left therefrom onto a dirt road. At that place he was ordered to stop and the colored man departed from the cab. The appellant then drove on down this dirt road and ran the cab into a ditch. The appellant says that he left the cab and went into the woods near the place where the cab had been ditched and stayed there the

rest of the night and all of the next day and late that evening went to the home of his brother, who lived nearby. He says that this brother, at his request, took him to his home in Florence, where he was taken into custody by officers after they had been called by his employer.

The appellant, on cross-examination, was asked to describe the automobile in which the two colored men were riding that stopped the cab on Highway 76 by sounding a siren. He said that he could not describe the automobile because he never did look back.

The appellant was asked to give a description of the colored man who entered the cab with a gun in his hand, sat beside him, and rode to the scene of the killing and thereafter accompanied him in the cab as is herein before set forth. He could not make an estimate as to his weight, size or height, nor as to how he was dressed. The only description he could give was that he was "a black man."

The appellant was also asked to describe the weapon that the colored man had when he entered the cab and which was used in the killing of the deceased, and whether it was a pistol, an automatic, silver-plated, stainless steel, a blue or a black gun. He answered that it was a "dark looking gun."

The appellant admits that he was sitting in the front seat with the driver of the cab to his left and the colored man to his right. He had testified that while the shooting was taking place that he "lent over" down next to the foot of the automobile. When questioned as to when he did this, he said that the colored man "had done shot before he lent over." He further testified that he made no effort to take the gun away from the colored man or to stop him from shooting, nor did he have any idea as to how many shots were fired. The appellant said that neither he nor the colored man got out of the car at the place where the shooting occurred. He also said that he did not see the taxi driver fall or get out of the cab, but when he started to drive off he did see the taxi driver lying in the road ahead of the cab.

The appellant, on cross-examination, admitted that he purchased a .32 caliber Rossy pistol and a box of bullets from a department store in Mullins, South Carolina, and when questioned as to the whereabouts of this gun, he testified that he kept it about a week, went over to Mullins and got to drinking, caught a ride with some man who he did not know, to Florence and because of his drunkenness he did not go to where he lived, but slept beside a brick building near Highway 76. He said when he woke up the next morning his gun and billfold were gone. He admitted that he did not report this theft to any law enforcement agency, his explanation being that he knew it was a violation of the law for him to have a gun.

The appellant further testified, on cross-examination, that while he was in the woods that he saw police officers and police automobiles in the area and he was approximately forty or fifty yards from them. He admitted that he could have "hollered" to the officers but explained that he did not know they were looking for him.

We have carefully considered the testimony contained in this voluminous record. It is our conclusion that the evidence and circumstances heretofore related, when taken together, were sufficient to warrant an inference of guilt. This required the trial judge to submit the issue to the jury. It follows that the trial judge committed no error in so doing.

The exceptions of the appellant are overruled and the judgment below is,

Affirmed.

LEWIS, BUSSEY, BRAILSFORD and LITTLEJOHN, JJ., concur.