STATE of Utah, Plaintiff and Appellee,

v.

Steven Ray JAMES, Defendant and Appellant.

Nos. 890309, 890474.

Supreme Court of Utah.

Oct. 15, 1991.

R. Paul Van Dam and Charlene Barlow, Salt Lake City, for plaintiff and appellee.

Nathan D. Hult and Robert W. Gutke, Logan, for defendant and appellant.

HALL, Chief Justice:

Defendant Steven Ray James appeals his conviction of first degree murder for the killing of his son and his sentence to life imprisonment. On Tuesday, August 26, 1986, at approximately 12:54 p.m., defendant reported that his infant son Steven

Roy James was missing from a parked car near the west entrance of the Osco Drug parking lot in Logan, Utah. On October 11, 1986, duck hunters found the remains of an infant later identified as Steven Roy James submerged in an area known as the Bear River Marina in Cache County.

Defendant was arrested on October 23, 1986, and charged with first degree murder[1] for the death of Steven Roy James. The aggravating circumstance which raised the charge to first degree murder was defendant's previous conviction of a felony involving the use or threat of violence to a person, specifically, his 1973 California conviction for the crime of false imprisonment, which is there categorized as a felony.

Defendant was granted a change of venue due to the extensive publicity surrounding the case, and on May 1 through May 12, 1989, he was tried before a jury in the Third Judicial District Court in Salt Lake County. He was convicted of murder in the first degree and sentenced to life imprisonment. Defendant appeals his conviction on the following grounds: (1) that he was denied due process, the right to counsel, and the right to a fair and impartial jury by the manner and method of voir dire of the prospective jurors in his case; (2) that the court should have sustained defendant's objection to evidence of the 1973 California conviction of false imprisonment as the aggravating circumstance enhancing his offense to that of first degree murder; (3) that the court should have granted defendant's motion for judgment notwithstanding the verdict or motion to record conviction for the next lower category of offense due to lack of substantial evidence showing an intentional or knowing killing; (4) that the denial of access to his attorneys while in the Salt Lake County jail violated his right to counsel and his right of access to the courts; (5) that the court erred by refusing to give certain jury instructions regarding circumstantial evidence; and (6) that the trial court erred in refusing to

grant defendant a new trial based upon newly discovered evidence.

## I. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the trial court erred in denying his motions for judgment notwithstanding the verdict and for recording conviction of the next lower category of offense. These motions were based upon the alleged lack of evidence showing an intentional and knowing killing and were essentially challenges to the sufficiency of the evidence against him. They will therefore be reviewed as claims of insufficient evidence. In reviewing a defendant's claim that he was convicted on insufficient evidence, this court must be mindful of the proper standard of review, which gives great deference to jury verdicts. We have previously stated:

> The proper standard of review for appeals concerning the sufficiency of evidence is well established. In making the determination as to whether there is sufficient evidence to uphold a conviction, an appellate court does not sit as a second fact finder. It is not the function of a reviewing court to determine guilt or innocence or judge the credibility of witnesses. The mere existence of conflicting evidence, therefore, does not warrant reversal. Rather, the function of a reviewing court is limited to insuring that there is sufficient competent evidence as to each element of the charge to enable a jury to find, beyond a reasonable doubt, that the defendant committed the crime.[2]

█ Therefore, when reviewing a claim of insufficiency of the evidence, this court views the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the jury verdict. It is only when the evidence as viewed in this light is sufficiently inconclusive or inherently improbable that a jury must have entertained a reasonable doubt as to the

1. Utah Code Ann. § 76–5–202. Prior to the trial of this case, the State stipulated that it would not seek the death penalty against James, but would seek life imprisonment.

2. *State v. Warden,* 813 P.2d 1146, 1150 (Utah 1991) (footnotes omitted).

defendant's guilt that it is proper to overturn the conviction.[3]

The following evidence was presented in support of defendant's conviction at trial. The child's mother, Victoria DeLeon, testified that on the morning of the child's disappearance, James awoke early with her and watched for her ride to work so that she could spend additional time with the baby. She testified that he had never before helped her with the baby in the morning. When her ride arrived, she left the child in defendant's care and went to work. At approximately 2 p.m., she was approached at work by a police officer and told that her baby was missing. The officer took her to the police station, where she approached defendant and asked him where the baby was. Defendant answered, "I am sorry. I didn't do it on purpose." Defendant told her that he had left the baby in the car when he went into Osco Drug and that when he returned in ten minutes, the baby was gone.

Victoria DeLeon testified that she had been concerned about defendant's care of the baby. She testified that there were several instances when the baby was injured while in defendant's custody. The baby was not hurt when he was in the custody of other babysitters. She testified of instances when defendant gave the baby a cold bath, when defendant took the baby into the cold garage without a wrap, when she found a red mark on the child's upper lip which defendant said was caused by the baby's bottle, when the child fell from the front seat to the floor of the car while defendant was driving because the infant was not in his safety carrier, when the child received a bruise on his head while he was being carried by defendant, when she found red marks on the child's neck which defendant told her were caused by the baby's shirt, when she found finger marks on the baby's rib cage, when defendant told her that he dropped the baby while opening a can, and when defendant put the heating pad under the child on hot instead of warm.

Victoria DeLeon further testified that defendant often became angry with her when she questioned him about his care of the child and that he told her after these instances that she worried too much about the child. She and defendant also had arguments about the course of the police investigation. He became angry with her when she went to the police station for questioning one afternoon. He also became angry when she provided the baby's birth certificate with the baby's footprints on it, a Father's Day card with the baby's handprints, and photographs of the baby to the police to help find the child. Defendant told her not to give these things to the police. She testified that defendant was jealous of the baby. Defendant's unemployment and the attendant money problems caused dissension between her and defendant. The expenses associated with the baby compounded these money problems. She also testified that defendant had used drugs prior to the baby's birth and had gone to Salt Lake City for drugs once before the baby's birth, but that she did not know if defendant used drugs after the child was born.

Officer Mike Vaughan of the Logan City Police testified concerning his investigation of the child's disappearance and of the later investigation of defendant as the leading suspect in the case. Officer Vaughan was the first to respond to the scene of the child's disappearance, arriving at 12:57 p.m. At Officer Vaughan's questioning, defendant said that he had locked the doors of the car but that the windows were down for ventilation. At that point, defendant reached through the open window of the passenger door and unlocked that door. Inside was the dog, a baby car seat on the front seat of the car facing the driver's side, and a baby bottle. After the door was unlocked, the officer opened it. The dog, who had been running around in the car, immediately jumped out. Officer Vaughan asked defendant if anything else was missing; defendant responded that nothing was. Defendant and Vaughan then went to the James residence, which was locked, to look for the baby. They looked around the place but did not find the

3. *Id.*

baby or anything unusual. Defendant did not state that anything was missing or out of place at the home.

On the evening of August 26, police questioned defendant concerning the events of the day in an effort to develop leads concerning the child's disappearance. He gave the police a description of the baby and described his activities of the day with the baby. On the morning of the child's disappearance, defendant arose at 5:20 a.m. with DeLeon before she left for work. Defendant stated that he got up early to look for her ride so that she could spend more time with the baby. Defendant went back to bed with the baby after DeLeon left for work and awoke about 8 or 8:30 a.m. At about 9 a.m., defendant put the baby on the couch and fixed some water damage in the shower. When he ran out of DAP putty, he decided to go to a store in Logan. At this time, about 10:30 a.m., the baby was asleep, so defendant left him and their dog at home while he went to the store. Defendant returned about fifteen minutes later and found the baby still asleep. Defendant showered and relaxed by listening to the stereo until about noon. He decided at this time to run other errands.

Defendant fed and changed the baby and started the family Cadillac at 12:40–12:45 p.m. He then picked up the baby and the dog and placed the baby in his carrier in the passenger side of the car. He drove to the parking lot of Osco Drug but could not find a parking space in the shade, so he pulled to the west side of the store under some trees, rolled the windows down about six inches, and went into Osco Drug. Defendant stated that he left the doors unlocked. He came out of the store about five to ten minutes later. He walked to the car and opened the driver's door, at which time he noticed that the baby was gone. He ran to the pay phone at Osco Drug and telephoned the Logan City Police.

Officer Vaughan also testified about the efforts of the Logan Police to locate the missing child and about the investigative findings which eventually led the police to suspect defendant as the responsible party.

The evidence showed a wide-ranging and intensive search for the baby by law enforcement, both in the Logan area and nationwide. Investigation by law enforcement disclosed that defendant's purchase at Osco Drug was completed at 12:46 p.m. and the call to police was received at 12:54 p.m. The police were able to find witnesses who had been in the area of Osco Drug during the relevant time frame. None of these witnesses saw anyone take the child from defendant's car. None of the witnesses looked inside the car, and none noticed whether a baby was in the car. Only one witness saw anyone near defendant's car during the relevant time frame. Marthan Ferguson was driving near Osco Drug between 12:30 and 12:45 p.m. on August 26. She saw defendant's car parked at the curb near the store. She was stopped at a stop sign, waiting to cross 500 North, when she saw a girl with long blond hair approach defendant's car. The girl walked across the street and tried to open the driver's door of defendant's Cadillac. The door apparently was locked. Mrs. Ferguson could see defendant's poodle running back and forth across the front seat; she assumed the girl was trying to let the dog out because of the heat that day. Mrs. Ferguson did not see whether there was a baby inside defendant's car; however, if there was a baby, the dog was running over it.

Witnesses also testified concerning defendant's activities while he was in the Osco store. One witness who was in the checkout line behind defendant testified that defendant appeared nervous as he made his purchase. She testified that her husband, a uniformed highway patrolman, was with her in the checkout line. Defendant did not make any attempt to solicit help from the witness or her husband after he left the store, although they were traveling in a marked patrol car.

Two witnesses testified that they saw a wrapped bundle in the marsh several miles outside of Logan. One witness, a hunter, opened the bundle and discovered that it contained human remains. He contacted the police. The body was wrapped in a mattress cover, tied with electrical cord, and weighted with rocks. It was identified

by the palm prints, footprints, and hair samples, which were similar to those of defendant's son, and the clothing on the body was similar to what the baby was wearing when he disappeared. From this, it was concluded that the body was that of the missing James child.

The medical examiner who performed the autopsy on the infant stated that decomposition made it difficult to ascribe a cause of death. The death was certified as a homicide due to the manner in which the body was wrapped and disposed of. The examiner found no evidence of sharp or blunt forced injuries or of fractures of bones or skull. The examiner could not rule out death by shaking, suffocation, drowning, or SIDS, but could not ascribe any of these as the cause.

Dr. Kent Glanville of the Utah crime lab performed the identification tests on the infant and tests on the material of the mattress cover in which the child was wrapped. Police had already determined that the mattress cover was similar to those used by defendant to move to Logan. Don Lawhan, defendant's former landlord, identified the mattress cover as one he had lent to defendant for the move. Lawhan identified the mattress cover from a hole in the fabric and from the paint splatters on it. Paint samples taken from this mattress cover matched paint taken from the walls of the home in which defendant had lived in Preston, Idaho, and from the baby's bedroom in the apartment in Logan. After the mattress cover was identified as belonging to defendant, he was arrested and charged with the murder of his son.

After his arrest, defendant was housed in the Cache County jail pending trial. While there, he shared his cell with Ronald Peterson, Jon Lippencott, and Travis Goodwin. At trial, the State called Ronald Peterson, then an inmate at the Utah State Prison. Peterson testified that sometime between November and December 1986, he overheard a conversation between James and Lippencott. His testimony was as follows:

Q. Do you recall what they were talking about?

A. About the death of the baby, what was going on in court.

Q. What did Mr. James say in regards to the death of the baby?

A. In fact, he said he had done it, to Jon.

Q. Were you also present—during this same conversation was there also a conversation concerning the Bear River Marina, also known as the Valley View Marina, on the Bear River?

A. Yes. He said he had been out there the day before.

Q. The day before—

A. The incident had happened.

Q. The baby had disappeared?

A. Yes.

Defendant contends that the above evidence is insufficient to support his conviction for first degree murder. Specifically, he argues that the evidence does not prove the element of an intentional or knowing killing required for conviction of first degree murder. Utah Code Ann. § 76-1-501 requires that each element of a criminal offense be proven beyond a reasonable doubt.[4] In a homicide case, this requires proof that a death occurred, that it occurred by criminal means, that the defendant was responsible for the crime, and that the defendant acted with the requisite criminal intent for the crime with which he is charged. The first two of these requirements, proof that the victim is dead and proof that the victim died by criminal means, are often referred to as the corpus delicti. In this case, the proof of the victim's death was complete when the child's body was identified after being found in the Bear River. Defendant does not seriously contest that the body found in the

4. Utah Code Ann. § 76-1-501 states:

(1) A defendant in a criminal proceeding is presumed to be innocent until each element of the offense charged against him is proved beyond a reasonable doubt. In absence of such proof, the defendant shall be acquitted.

(2) As used in this part the words "element of the offense" mean:

(a) The conduct, attendant circumstances, or results of conduct proscribed, prohibited, or forbidden in the definition of the offense;

(b) The culpable mental state required.

river was that of his son. He argues that the second portion, or death by criminal means, has not been proven.

■ In proving that the cause of death was by criminal means, not by accident, the State may use circumstantial evidence relating to the condition of the body when it was found. It is not necessary for the actual cause of death to be determined, and several courts have held that the corpus delicti was sufficiently proven where no cause of death was established. For example, in *State v. Petree*,[5] the victim was last seen with the defendant being dropped off at the defendant's house. Later, when the victim's parents asked the defendant if she was there, he said that she had left with a blonde man. The victim remained missing for a year and a half, when her body was found in a carrot cellar in a clearly unnatural position. Law enforcement officials and experts who examined the corpse concluded that she must have been dead when placed there.[6] The court held that there was sufficient evidence to establish the corpus delicti and that the circumstantial evidence relating to the position and location of the body supported an inference of criminal activity and an intent to hide the evidence of the crime.[7]

Factually similar to the present case is *State v. Thomas*.[8] In *Thomas*, the defendant was convicted of manslaughter. She appealed, claiming that there was no proof of the corpus delicti to support the entry into evidence of her admissions and out-of-court statements.[9] The fact of the death of the victim was proven, but the defendant contested that there was not sufficient proof of criminal agency in the death. The victim was last seen by his wife on August 18, 1951, at about noon. He went fishing with the defendant, her husband, and her husband's brother. The victim had a half pint bottle of whiskey which was consumed by the four of them. The body of the victim was found five days later, badly decomposed. An autopsy revealed that the soft tissue over his face was completely absent, as were most of the bones of the lower jaw. The upper jaw was fragmented, the middle half of the right upper cheek was missing, with fragments found attached by cord strands to the rest of the facial bones. The pathologist could not give a specific cause of death. He could say that the victim's facial structure was subjected to force. A blow causing the damage found on the face would cause death. There was evidence that the river in which the body of the victim was found carried logs and other debris within its waters.[10] The court held that there was sufficient evidence of criminal means as the cause of the victim's death to support the corpus delicti and admitted the out-of-court statements.[11]

■ In addition to evidence from which proof of the corpus delicti may be made in this case, the evidence is also sufficient to support a finding that defendant bore responsibility for the death. The mattress cover in which the infant's body was wrapped was positively identified as an item that was in defendant's possession. Don Lawhan identified the mattress cover as one owned by him and loaned to defendant and Victoria DeLeon. Paint samples on the mattress cover matched paint in defendant's Logan apartment. Defendant did not claim that this mattress cover was taken from the car along with the kidnapped child. He gave no explanation for the presence of the mattress cover around the body. This mattress cover was in defendant's possession and control at the time of the baby's disappearance and is inconsistent with defendant's kidnapping theory. The jury was entitled to determine that defendant used the cover to wrap the child prior to concealing the bundle in the marina waters. This evidence of concealment was sufficient for the jury to find

5. 659 P.2d 443 (Utah 1983).

6. *Id.* at 444.

7. *Id.*

8. 222 S.C. 484, 73 S.E.2d 722 (1952).

9. *Id.* 73 S.E.2d at 723.

10. *Id.* at 724–26.

11. *Id.* at 726.

that defendant was responsible for placing the mattress cover containing the child into the water and to infer that defendant was responsible for the child's death.[12]

■ Defendant next argues that even if the evidence is sufficient to prove that he disposed of the child, there is insufficient evidence of his intent to support a conviction of murder. Defendant argues that the circumstantial evidence in this case does not show that he intentionally or knowingly killed his son, as required for a conviction of first degree murder. It is well established that intent can be proven by circumstantial evidence. Indeed, unless a confession is made by the defendant concerning intent, or unless the court is somehow able to open the mind of the defendant to examine his motivations, intent is of necessity proven by circumstantial evidence.

The question remains, however, whether the circumstantial evidence produced by the State is sufficient to establish that defendant intentionally or knowingly killed his son. Several cases in Utah have reviewed claims where it was argued that the circumstantial evidence was not sufficient to prove the defendant's intent.[13] One of the circumstances traditionally used to sup-

ply evidence of guilt is flight or concealment of the crime.[14] However, many of the well-reasoned cases hold that flight is not evidence of premeditation or intent. Flight or concealment shows the guilty conscience of the accused as a result of the crime committed. It does not show the state of mind prior to the criminal act or event. For example, while this court held in *State v. Bales*[15] that an instruction on flight or concealment of a crime may be given to supply an inference of guilt, it also held that an instruction that flight constituted an admission of guilt was erroneous.[16] The court reasoned in *Bales* that just because flight was a circumstance establishing an inference of guilt, that inference should not be equated with an admission of guilt.[17] Similarly, although flight or concealment may give rise to an inference of a guilty conscience and therefore an inference of guilt, that inference may not be built upon to create an inference of the defendant's intent before the act was committed.[18]

The case of *State v. Foster*[19] is illustrative of the distinction between flight as evidence of guilt and flight as evidence of intent to kill. Foster was prosecuted for

---

**12.** *See State v. Bales,* 675 P.2d 573, 574–75 (Utah 1983); *State v. Crawford,* 59 Utah 39, 201 P. 1030, 1033 (1921); *see also State v. Quila,* 108 Ariz. 488, 502 P.2d 525, 527 (1972).

**13.** *See, e.g., State v. Pierce,* 722 P.2d 780, 782 (Utah 1986) (evidence sufficient to show intent to retain and receive stolen property); *State v. Dumas,* 721 P.2d 502, 504–05 (Utah 1986) (evidence sufficient to prove intent to kill in attempted murder case); *State v. Isaacson,* 704 P.2d 555, 557–58 (Utah 1985) (sufficient evidence to uphold conviction for aggravated burglary); *State v. Nebeker,* 657 P.2d 1359 (Utah 1983) (evidence, including identifications by victim and neighbor, sufficient to sustain conviction of burglary and aggravated assault); *State v. McCardell,* 652 P.2d 942, 944–45 (Utah 1982) (evidence sufficient to sustain conviction for forging endorsement on check); *State v. Howell,* 649 P.2d 91, 97 (Utah 1982) (evidence sufficient to support convictions for manslaughter and attempted manslaughter); *State v. John,* 586 P.2d 410, 412 (Utah 1978) (evidence that defendant had sole custody and care of child at time fatal injuries incurred sufficient to support conviction for manslaughter); *State v. Nicholson,* 585 P.2d 60, 62–63 (Utah 1978) (evidence sufficient to support conviction for second degree murder in death of child by starvation); *State v.*

*Wilson,* 565 P.2d 66, 68 (Utah 1977) (evidence sufficient to sustain conviction for distribution of heroin); *State v. Wardle,* 564 P.2d 764, 766 (Utah 1977) (evidence sufficient to sustain conviction for second degree murder); *State v. Romero,* 554 P.2d 216, 219 (Utah 1976) (evidence sufficient to sustain convictions for burglary and theft); *State v. Kelsey,* 532 P.2d 1001, 1004–05 (Utah 1975) (evidence sufficient to sustain second degree murder conviction in killing of three-year-old child); *State v. Schad,* 24 Utah 2d 255, 470 P.2d 246, 248 (1970) (evidence sufficient to support second degree murder).

**14.** *See* 2 Wigmore, *Evidence* §§ 273, 276 (Chadbourn rev. 1979 & Supp.1991).

**15.** 675 P.2d 573 (Utah 1983).

**16.** *Id.* at 575.

**17.** *Id.*

**18.** *See generally* Annotation, *Flight as evidence of guilt,* 25 A.L.R. 886 (1923); 75 Am.Jur.2d *Trial* § 788 (1974).

**19.** 130 N.C. 666, 41 S.E. 284 (1902).

first degree murder. Before the incident in question, Foster had threatened to "fix" the victim. On the evening of the incident, he cursed the victim and threw a rock at him which hit him in the head, inflicting a wound from which he later died. After he threw the rock, Foster ran into the woods and hid for about two weeks, until he received assurance from another that he would not be mobbed if he turned himself in.[20] Foster admitted at trial that he was guilty of second degree murder, making the sole issue for the jury a question of whether there was sufficient evidence to prove that the murder was committed with malice aforethought. The court held that an instruction to the jury that it could consider the flight of Foster as evidence of his guilt was erroneous, given the facts of the case. The court reasoned:

> [W]e are entirely unable to see why the attention of the jury should have been specially called to the prisoner's flight in the charge of the court, and told that this was a circumstance that they must consider, in connection with the other evidence, in making up their verdict. We entirely fail to see how it shows or tended to prove deliberation and premeditation on the part of the prisoner, and that was the only matter the jury had to consider, as it had been admitted that the prisoner was guilty of murder in the second degree.[21]

Evidence of elaborate efforts to conceal a crime and forestall investigation have also been held not to constitute evidence of intent to kill the victim. In *Stafford v. People*,[22] the Colorado Supreme Court reversed a conviction for first degree murder where an instruction was given allowing the jury to infer an intent to kill based upon the defendant's efforts to conceal his wife's death and upon his subsequent flight. That court stated:

> The fact that defendant buried the body, repeatedly lied concerning the dis-

appearance of [his wife], went under an assumed name and, while awaiting trial, escaped from jail, was properly submitted to the jury as evidence of guilt and consciousness of guilt, but the same does not serve to supply the missing element of malice.

> . . . .

> There being no evidence of malice, premeditation, deliberation, intention to kill, or killing showing an abandoned and malignant heart, it was error to submit to the jury instructions defining murder and forms of verdict whereby they could find the defendant guilty of murder.[23]

■ Consistent with these cases, we hold that evidence of flight or concealment of a crime does not support an inference of intentional conduct on the part of the accused. Therefore, other evidence of the defendant's intent must be present in the record to support the jury's verdict.

In the majority of cases, evidence of intent is generally supplied by evidence of the injury by which the victim died or of the act which caused the death. The inference is made that the natural consequences of that act were intended to occur. These types of cases turn on the nature of the injury leading to death and the relative level of carelessness or intent that can be inferred therefrom.

For example, in *State v. Bolsinger*,[24] the defendant was convicted of murder as a result of an incident which occurred while he and the victim were engaged in consensual sexual intercourse. The evidence indicated that both the defendant and the victim were very drunk, that the cord of the victim's clock radio was placed around her neck, and that defendant pulled lightly on the cord for "a few seconds." The victim died as a result of the cord's being placed around her neck. There was no evidence of struggle between the two or that defendant was angry with the victim or intended

20. *Id.* 41 S.E.2d at 284.

21. *Id.* at 287.

22. 154 Colo. 113, 388 P.2d 774 (1964) (*en banc*).

23. *Id.* 388 P.2d at 778.

24. 699 P.2d 1214 (Utah 1985).

to harm her.[25] On appeal, this court reduced his conviction from murder to manslaughter, due to the lack of evidence that his act of pulling on the cord was done with the requisite intent for murder.[26] The court held that the jury could not reasonably have found evidence of an intentional or knowing killing or that the circumstances indicated a depraved indifference killing. The evidence merely pointed to a reckless disregard of the risk of the victim's death.[27]

This court in *State v. Watts*[28] upheld a conviction for second degree murder of a 14–month–old child where the evidence showed that the child had sustained numerous bruises to his left side, three bruises to his scalp, a depressed skull fracture above and behind his left ear which resulted from a blow by the corner of an object consistent with the shower head used to bathe the child, and a perforation of the small intestine with resulting peritonitis caused by a severe blow from an object in the area of an external bruise near his navel, again consistent with the shower head.[29] In ruling that the evidence was sufficient to show an intent on the part of the defendant to kill the child, the court quoted from *People v. Drumheller.*[30] In *Drumheller,* the Illinois Supreme Court stated:

It is not necessary to directly prove that [the defendant] had an intent to kill, only that he voluntarily and willingly committed an act, the natural tendency of which was to destroy another's life. In such instances the intent can be implied or inferred from the character of the act. Further, the fact that defendant, on three previous occasions, inflicted injuries upon the child, refutes the suggestion that his actions were accidental or reckless. His act formed sufficient basis for the jury to conclude beyond a reasonable doubt that the defendant knew or should have known that his conduct ... would create a strong probability of death or great bodily harm.[31]

The above-cited cases based the inference of intent upon the acts committed by the defendants. From the very nature of these acts, a reasonable jury could determine that the acts were committed with the requisite intent for the crime charged. The distinction between the above cases and the instant case is clear. Defendant James has confessed to no act which caused the death of his son, and no act or injury causing

25. *Id.* at 1215–17.

26. *Id.* at 1219–21 (Howe, J., joined by Durham, J.), at 1226 (Stewart, J., concurring in the result).

27. *Id.* at 1219–21 (Howe, J., joined by Durham, J.), at 1226 (Stewart, J., concurring in the result).

28. 675 P.2d 566 (Utah 1983).

29. *Id.* at 566–68.

30. 15 Ill.App.3d 418, 304 N.E.2d 455 (1973).

31. *Id.* 304 N.E.2d at 457–58 (citations omitted); accord *State v. DeMille,* 756 P.2d 81, 83 (Utah 1988) (evidence of severe skull fracture sustained while child in defendant's care sufficient to support conviction for second degree murder); *State v. Valdez,* 748 P.2d 1050, 1054–55 (Utah 1987) (evidence that child's mother was shot and child thrown alive into river sufficient to sustain first degree murder conviction); *State v. Fontana,* 680 P.2d 1042, 1048 (Utah 1984) (evidence that defendant pointed gun at victim and fired shot sufficient to convict of second degree murder); *State v. Tanner,* 675 P.2d 539, 550–51 (Utah 1983) (evidence that child suffered from battered child syndrome and died of subdural hematoma caused by blow to head while she was in defendant's care sufficient to support conviction for manslaughter); *State v. Maestas,* 652 P.2d 903, 905–07 (Utah 1982) (evidence that defendant pointed gun out car window and shot in direction of officer sufficient to support conviction for attempted first degree murder); *State v. Mendell,* 111 Ariz. 51, 523 P.2d 79, 82–83 (1974). *But see Arnett v. State,* 245 Ga. 470, 265 S.E.2d 771, 772–73 (1980) (evidence that child died of subdural hematoma from wound received in defendant's care not sufficient to support conviction for second degree murder where instruction on involuntary manslaughter not given to jury); *Vancel v. State,* 100 Tex. Crim.App. 39, 272 S.W. 130, 131 (1925) (evidence that defendant buried child near dipping vat insufficient to sustain conviction for murder where no evidence of cause of death found); *Seidler v. State,* 64 Wis.2d 456, 219 N.W.2d 320, 326 (1974) (evidence that child died of wound received when defendant threw her across room and she hit bunkbed not sufficient to support conviction of second degree murder; new trial for manslaughter granted).

death can be determined from the report of the medical examiner.

However, another type of case arises where there is no evidence of the cause of death and often no evidence of the victim's body. These cases infer intent from the overall circumstances of the death, including the defendant's motive for doing away with the victim and evidence of a plan to kill or dispose of the victim.[32]

Such is the type of case presented here. The prosecution presented competent evidence from which the jury could infer intent. The prosecution presented evidence of past abuse of the child at the hands of defendant, evidence of defendant's jealousy of the child and the attention the child received from his mother, evidence of friction between defendant and the mother caused by the child and their different opinions of how he should be cared for, and evidence of financial problems which were caused or contributed to by the birth and presence of the child. Evidence of jealousy of a child and of past abuse is relevant in proving a defendant's pattern of conduct toward the child and the absence of accident or mistake in the incident which caused the child's death.[33] In *State v. Tanner*,[34] testimony included expert opinion regarding evidence of battered child syndrome. The defendant objected to this testimony, claiming that it was evidence of prior bad acts in violation of former Utah Rule of Evidence 55. The court held that evidence of battered child syndrome is competent. It does not directly indicate bad acts or culpability of a particular defendant. The pattern of abuse is relevant to show the intent of the act which caused the death and is relevant to show that someone injured the child intentionally rather than accidentally.[35] The *Tanner* court stated:

In cases of child abuse, such as the one before us, evidence of specific instances of defendant's treatment of the child is relevant to establish not merely a general disposition for violence or ill-will towards all children, but to establish a specific pattern of behavior by the defendant toward one particular child, the victim.... This pattern of behavior by the defendant is relevant to establishing absence of accident or mistake ..., opportunity, knowledge or the identity of the defendant as the person responsible for the crime charged.[36]

Similarly, evidence was introduced of prior injuries to Steven Roy James while he was in the care of defendant. From this, the jury could infer that defendant was not caring in his attitude toward the child and that he viewed the child as an obstacle to his happiness with Victoria DeLeon. This could reasonably have been viewed by the jury as sufficient evidence of a motive to do away with the child and used to infer defendant's intent to do so.

In addition to evidence of a motive to kill the child, the prosecution presented evidence that on the day prior to the child's disappearance, defendant had been to the marina where the body was found. This evidence, combined with defendant's unusual behavior in affording DeLeon the opportunity to spend additional time with her child on the morning of his disappearance, gives rise to the inference that defendant had formulated a plan to dispose of the child prior to the time the child disappeared. The apparent care with which the body was disposed of and the elaborate efforts to create an explanation for the child's absence by contacting the police and setting up the kidnapping story also aid in supporting an inference that the disappear-

---

**32.** *People v. Manson,* 71 Cal.App.3d 1, 139 Cal. Rptr. 275, 283–87 (1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978); *People v. Scott,* 176 Cal.App.2d 458, 1 Cal.Rptr. 600, 619 (1959), *cert. denied,* 368 U.S. 849, 82 S.Ct. 81, 7 L.Ed.2d 47 (1961); *State v. Garner,* 237 Kan. 227, 699 P.2d 468, 478 (1985); *Regina v. Onufrejcyzk,* 1 Q.B. 388, [1955] 1 All Eng.Rep. 247, 252–53 (Ct.Crim.App.); *The King v. Horry,* 1952 New Zealand L.Rep. 111, 124–25 (Ct.App.).

**33.** *See, e.g., Tanner,* 675 P.2d at 550–51; *Watts,* 675 P.2d at 569; *Hormsba v. Commonwealth,* 14 Ky.L.Rptr. 166, 19 S.W. 845, 845–46 (1892).

**34.** 675 P.2d 539 (Utah 1983).

**35.** *Id.* at 543.

**36.** *Id.* at 546–47.

ance was planned by defendant before it was carried out.

The evidence presented by the prosecution was not so inherently improbable that a reasonable jury could not have found defendant guilty beyond a reasonable doubt. The prosecution presented evidence of a possible motive of defendant for disposing of the child and of a plan by defendant to carry out his intentions. The evidence of a plan to dispose of the child was sufficient to enable a reasonable person to conclude that defendant intentionally killed the child. The trial court's refusal to grant a judgment notwithstanding the verdict was therefore not in error.

## II. MOTION FOR NEW TRIAL

Defendant made two motions for a new trial on the basis of newly discovered evidence. In his first motion, defendant obtained pictures of the driver's side door with the door in the unlocked position. Defendant claimed that the pictures constituted newly discovered evidence because the automobile from which the child was kidnapped was sold to another individual who was not located before trial. The car was located after trial, and the pictures obtained from the new owner confirmed defendant's testimony that the door was unlocked unless the lock lever was in a position level with the car door.

The second piece of evidence was obtained from Kenneth Lisner, an inmate at the Utah State Prison, who stated that Ronald Peterson, a key witness for the prosecution, told him that Peterson had fabricated his testimony at trial in an attempt to get better treatment from the State at his own criminal trial. Peterson testified at trial that he overheard defendant confess to another prisoner, John Lippencott, that he killed his son. Lippencott was not found and could not be brought into the state for defendant's trial. Motions for new trial were brought based

upon each of these two pieces of evidence. These motions were denied by the trial court.

Our review of the trial judge's decision to deny a motion for a new trial focuses upon whether that denial constitutes an abuse of discretion.[37] Trial judges are given a wide range of discretion in determining whether newly discovered evidence or errors which occurred within a trial merit the grant of a new trial. We assume that the trial court exercised proper discretion unless the record clearly shows the contrary.[38] Additionally, in order to constitute grounds for a new trial, evidence must meet three criteria:

(1) It must be such as could not with reasonable diligence have been discovered and produced at the trial; (2) it must not be merely cumulative; (3) it must be such as to render a different result probable on the retrial of the case.[39]

■ The trial judge ruled that evidence of the position of the car lock would have been available to defendant prior to trial through reasonably diligent investigation. Therefore, the judge found that the first criterion had not been met. Additionally, the trial judge found that the evidence of the car door locks was insignificant to the outcome of the trial and that the third criterion had not been met. The trial court did not abuse its discretion in denying defendant's motion on those grounds.

■ The trial judge denied defendant's second motion for a new trial based on his findings that none of the three criteria for a new trial had been met. However, the evidence of Peterson's perjury stands on a different footing than that presented in the first motion. This evidence was not reasonably discoverable before trial. Peterson apparently spoke to Kenneth Lisner concerning his fabrications to the police about two weeks before trial. He then told Lisner that he would not go through with the lie at trial. Lisner only discovered that

37. *State v. Williams,* 712 P.2d 220, 222 (Utah 1985).

38. *Id.; Logan City v. Carlsen,* 799 P.2d 224, 225 (Utah Ct.App.1990).

39. *State v. Gellatly,* 22 Utah 2d 149, 449 P.2d 993, 996 (1969).

Peterson had in fact committed perjury by watching news accounts of the trial after Peterson had already testified. Lisner did not attempt to contact defendant or his attorneys concerning the conversation until sometime in June 1989, after the trial, when defendant was placed in the same cell block with Lisner. Therefore, Lisner was unaware of Peterson's perjury until near the conclusion of the trial, and defendant was not aware of Lisner's knowledge until well after the trial.

Although the trial judge found that this evidence could have been discovered prior to trial through reasonable diligence, counsel represented at the hearing on the motion that during the period of his incarceration, Peterson was placed in the same cell or in direct contact with between fifty and one hundred prisoners, plus numerous guards and other prison officials. According to Lisner's affidavit, the conversations with Peterson took place in the middle of April 1989, approximately two weeks before trial of defendant's case. Therefore, defense counsel, in order to acquire this information prior to trial, would have had to obtain the names of and interview between fifty and one hundred prisoners during the two-week period prior to the trial. Given the difficulties inherent in obtaining visitation and interview privileges at the Utah State Prison, this seems to be an insurmountable task. It is unreasonable to expect that due diligence would require defendant to interview so many persons for evidence of Peterson's conversations with them in such a short period of time. Therefore, we hold that the evidence produced by Lisner which was discovered after the con-

clusion of the trial meets the first criterion of newly discovered evidence.

■■■■■■ The evidence also meets the second criterion for newly discovered evidence. The trial judge found that Lisner's testimony would be merely cumulative of James's testimony that he had never had a conversation with Lippencott. The trial judge also based his denial of the motion upon the fact that the testimony to be presented by Lisner went merely to the credibility of Peterson and did not present new evidence of defendant's innocence. While it is true that the refusal to grant a new trial based merely on evidence of credibility will generally not be overturned on appeal,[40] the credibility evidence went beyond refuting the testimony of Peterson and established independent evidence that he had deliberately committed perjury in an attempt to subvert the trial process to his own ends. This evidence was not merely credibility evidence and was not merely cumulative of James's testimony that he had not confessed to Lippencott. Lisner's testimony concerned a disputed fact that arose between Peterson's testimony and James's, whether or not Peterson's testimony concerning the overheard confession was truthful. The testimony of Lisner would corroborate that of James and provide independent evidence of his version of the facts. Evidence from a neutral third party is not merely cumulative of a criminal defendant's testimony.[41] It is of a different kind and nature than defendant's statements, and it certainly could have a different quality in the eyes of the jurors who assess the credibility of the witnesses. This evidence was not merely cumulative

40. *State v. Worthen*, 765 P.2d 839, 851 (Utah 1988).

41. *See, e.g., State v. Templin*, 805 P.2d 182, 188 (Utah 1990); *State v. Duncan*, 102 Utah 449, 132 P.2d 121, 125 (1942); *State v. Ames*, 112 Idaho 144, 730 P.2d 1064, 1067 (App.1986); *State v. Chavez*, 87 N.M. 38, 528 P.2d 897, 899 (1974). In *Duncan*, this court stated:
"Where disinterested testimony on the vital point in a case is very scant, newly discovered testimony on that point appearing from affidavits in support of the motion for a new trial to be apparently reliable, ... and it appears likely that such evidence would change the

result, a new trial should be granted. While the granting or refusing of the motion lies in the sound discretion of the court, where there is a grave suspicion that justice may have miscarried because of the lack of enlightenment on a vital point which new evidence will apparently supply, and the other elements attendant on obtaining a new trial on the ground of newly discovered evidence are present, it would be an abuse of sound discretion not to grant the same."
*Duncan*, 132 P.2d at 125 (quoting *Jensen v. Logan City*, 89 Utah 347, 57 P.2d 708, 723 (1936)).

but was independent evidence which corroborated defendant's statements.

█ The judge also determined that the result would not have been different if Lisner's testimony had been presented to the jury. In his decision denying defendant's motion for new trial, the trial judge stated that the third criterion had not been met due to the "overwhelming evidence of defendant's guilt." We disagree. Our review of the evidence presented in the case shows that evidence of an intentional or knowing killing, while sufficient, is not overwhelming or compelling. Without the evidence of a plan to kill the child which can be derived from Peterson's testimony, the evidence of an intentional or knowing killing is scant and susceptible to differing interpretations. Peterson's testimony went to the heart of the evidence against defendant. Evidence that defendant was at the marina prior to his baby's disappearance and therefore had formulated a plan to kill the child was crucial to finding that defendant had the requisite intent to be convicted of murder. Without Peterson's testimony, which established this evidence, it is probable that a reasonable jury would have had a reasonable doubt as to whether defendant had the requisite intent to commit murder.

The trial court based its denial of a new trial upon his determination that the three criteria outlined in *State v. Gellatly* had not been met. Our review of these criteria indicates that they have been met and that defendant is entitled to a new trial. Therefore, the trial court abused its discretion in denying defendant's motion based on evidence that Peterson testified falsely. We therefore reverse and remand this case for a new trial which will include the newly discovered evidence.

## III. OTHER ISSUES WHICH MAY ARISE ON REMAND

Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court.[42] Because of our disposition of this case in remanding for a new trial, we will address those issues raised by defendant which are likely to recur upon retrial of this matter.

### A. Defendant's Prior Conviction as an Aggravating Factor Increasing Conviction to First Degree Murder

Defendant's second contention is that Utah Code Ann. § 76-5-202(1)(h) was incorrectly applied to his case and that the subsection is void for vagueness and a violation of his right to equal protection of the laws. Defendant's conviction for first degree murder was based upon the aggravating circumstance set forth in subsection (h) of Utah's homicide statute.[43] That subsection lists as one of several possible aggravating factors

(h) the actor was previously convicted of first or second degree murder or of a felony involving the use or threat of violence to a person. For the purpose of this paragraph an offense committed in another jurisdiction, which if committed in Utah would be punishable as first or second degree murder, is deemed first or second degree murder.[44]

The prior conviction relied upon in applying subsection (h) to defendant is a 1973 conviction in the state of California for false imprisonment. This conviction is a felony in California under section 236 of the California Penal Code.[45] Defendant was charged originally with kidnapping and, as the result of a plea bargain, plead-

42. *Hiltsley v. Ryder*, 738 P.2d 1024, 1026 (Utah 1987) (Zimmerman, J., concurring); *Anderson v. Utah County Bd. of County Comm'rs*, 589 P.2d 1214, 1216 (Utah 1979); Utah R.App. P. 30.

43. Utah Code Ann. § 76-5-202.

44. *Id.*

45. Section 236 of the California Penal Code states: "FALSE IMPRISONMENT DEFINED. False imprisonment is the unlawful violation of

the personal liberty of another." Section 237 of the California Code provides the penalty for false imprisonment: "False imprisonment is punishable by fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not more than one year, or by both. If such false imprisonment be effected by violence, menace, fraud or deceit, it shall be punishable by imprisonment in the state prison."

ed guilty to the charge of false imprisonment. The charge to which defendant specifically pleaded stated that he had "wilfully, unlawfully and feloniously violate[d] the personal liberty of Sharon Elizabeth Cates, effected by violence, menace and force." Defendant received a sentence of one year in prison, which was suspended, and he was placed on probation for three years. He argues that the charge of false imprisonment, which was a felony in California where it was committed, would only be classified as unlawful detention, a class B misdemeanor, in Utah.[46]

The trial judge's denial of defendant's motion to exclude evidence of the prior California conviction for purposes of enhancing his conviction to one of first degree murder was based upon the judge's interpretation of Utah's first degree murder statute. The appropriate standard of review for a trial court's interpretation of statutory law is correction of error.[47]

The application of the statute's aggravating circumstances clearly applies to all felony convictions where a defendant has been charged with using violence or threat. On its face, the portion of the statute that deals with whether a charge which is differently named is equivalent to a similar conviction in Utah only applies to first or second degree murder charges. All violent felonies committed in other states would therefore qualify as aggravating circumstances under the statute. This reading of the statute is clear and understandable to the ordinary person and provides notice of what is prohibited as first degree murder in Utah. Therefore, the statute is not void for vagueness.[48]

Defendant also claims that the statute is a violation of his right to equal protection of the laws because its application depends on what classification another state may give to crimes committed within their jurisdiction. Equal protection requires that in classifying crimes, the legislature create classifications which bear a reasonable relationship to a valid governmental objective and which reasonably further that objective.[49] " 'A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality.' "[50]

In designing subsection (h) of the first degree murder statute, the legislature has met this burden. The statute allows as aggravating circumstances all felony convictions for violent crimes, whether committed in Utah or in another state. The purpose behind the aggravating circumstances requirement in Utah's first degree murder statute is to distinguish between those types of murders which the legislature feels should be punished more severely than other murders. Subsection (h) distinguishes between those persons with a history of violence and those without such a history. Punishing murderers with a past history of violence more severely than other murderers is rationally related to the state's objectives of punishing criminals according to the seriousness of their acts and protecting its citizens from criminal violence.[51]

46. Unlawful detention is defined in section 76–5–304 of Utah Code Annotated:
(1) A person commits unlawful detention if he knowingly restrains another unlawfully so as to interfere substantially with his liberty.
(2) Unlawful detention is a class B misdemeanor.

47. *Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1040 (Utah 1991); *Division of Consumer Protection v. Rio Vista Oil, Ltd.,* 786 P.2d 1343, 1347 (Utah 1990); *Kelson v. Salt Lake County,* 784 P.2d 1152, 1154 (Utah 1989).

48. *State v. Pilcher,* 636 P.2d 470, 471 (Utah 1981).

49. *State v. Bell,* 785 P.2d 390, 398 (Utah 1989); *State v. Bishop,* 717 P.2d 261, 266 (Utah 1986); *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961).

50. *Utah Public Employees' Ass'n v. Utah,* 610 P.2d 1272, 1274 (Utah 1980) (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)); *see also State v. Bell,* 785 P.2d at 400.

51. *See Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 60–61, 82 L.Ed. 43 (1937).

In meeting this objective, the statute contains two requirements, the status of the prior conviction as a felony and the requirement that the felony involve violence or threat of violence. The legislature's reliance upon other states' statutory classifications of crimes is a rational method for distinguishing which crimes are more serious. The combination of this or another state's decision that the crime should be a felony with the statute's requirement that the felony involve violence is sufficient to ensure that those who are convicted of the aggravating circumstances under the statute have previously committed serious crimes.

### B. Denial of Due Process by Trial Court's Limitation of Voir Dire

Defendant asserts that the trial court's limitation of voir dire of the prospective jury panel denied him his right to due process and violated his right to effective assistance of counsel. Specifically, defendant claims that the trial judge should have allowed questioning of prospective jurors by counsel, should have questioned jurors more thoroughly concerning media exposure and possible bias resulting therefrom, and should have allowed individual or small-group questioning of jurors to determine possible bias.

Without commenting on the effectiveness or the wisdom of the process of voir dire which was used in the trial below, this court wishes to address these issues in light of the recent United States Supreme Court case of *Mu'Min v. Virginia.*[52] That case also deals with juror voir dire in a case involving extensive publicity and controversy.[53] In *Mu'Min,* the Supreme Court held that while questions covering possible bias of jurors must cover the subject involved,[54] the questions asked of jurors do not need to follow any specific formula to pass constitutional muster.[55] Specifically, the Court held that the constitution does not require that a prospective jury panel be questioned during voir dire as to the content or source of publicity to which they have been exposed.[56] Following the logic of *Mu'Min,* no specific form of questioning need be followed in order for the voir dire to give a defendant his or her rights due under the constitution. The constitution does not require that jurors be questioned individually,[57] by counsel in the case,[58] or in any other particular arrangement. The manner and method of voir dire lies within the sound discretion of the trial court.[59]

In addition to this court's duty to hear and decide appellate cases which arise in this state, we also have a supervisory role over the lower courts within this state.[60] In fulfilling this role as supervisor, we would like to emphasize the important role that jury voir dire has in ensuring that all litigants in a case receive a fair and impartial jury. The modern voir dire process is not merely conducted to determine that jurors who have been called to service are legally qualified to serve on a jury panel. The process has evolved into a means of detecting and, so far as possible, eliminating bias and opinion from the court-

**52.** —— U.S. ——, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

**53.** *Id.* at ——, 111 S.Ct. at 1901, 114 L.Ed.2d 493.

**54.** *Id.* at ——, 111 S.Ct. at 1908–09, 114 L.Ed.2d 493; *see also Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850–51, 35 L.Ed.2d 46 (1973); *Aldridge v. United States,* 283 U.S. 308, 311, 51 S.Ct. 470, 471–72, 75 L.Ed. 1054 (1931).

**55.** *Mu'Min,* —— U.S. at ——, 111 S.Ct. at 1908–09, 114 L.Ed.2d 493; *Rosales–Lopez v. United States,* 451 U.S. 182, 188–89, 101 S.Ct. 1629, 1634–35, 68 L.Ed.2d 22 (1981).

**56.** *Mu'Min,* —— U.S. at ——, 111 S.Ct. at 1908–09, 114 L.Ed.2d 493.

**57.** *See, e.g., Akins v. State,* 502 P.2d 1274, 1275 (Okla.1972); *Engberg v. State,* 686 P.2d 541, 548 (Wyo.), *cert. denied,* 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984); *Woodmansee v. Stoneman,* 133 Vt. 449, 344 A.2d 26, 30 (1975).

**58.** *See Engberg,* 686 P.2d at 548.

**59.** *State v. Moton,* 749 P.2d 639, 643 (Utah 1988); *Engberg,* 686 P.2d at 548.

**60.** See Utah Constitution article VIII, section 4, authorizing supreme court to adopt rules of evidence and procedure for courts within the state and regulating the practice of law within the state.

room.[61] Because of the importance of the voir dire process, we would remind trial judges to take care to adequately and completely probe jurors on all possible issues of bias, including press coverage. This court has stated:

> "[V]oir dire examination has as its proper purposes both the detection of actual bias ... and the collection of data to permit informed exercise of the peremptory challenge."
>
> ....
>
> Although a trial judge has some discretion in limiting voir dire examinations, that discretion should be liberally exercised in favor of allowing counsel to elicit information from prospective jurors. Indeed, the fairness of a trial may depend on the right of counsel to ask voir dire questions designed to discover attitudes and biases, both conscious and subconscious, even though they would not have supported a challenge for cause.[62]

While a limitation on voir dire which permits some questioning concerning subjects of bias may be sufficient for constitutional purposes under the standards of *Mu'Min*, the liberal exercise of voir dire for the purpose of detecting bias should not be abandoned by the trial court. Although failure to question jurors concerning issues in any certain way desired by counsel or to ask any specific question desired by counsel does not rise to the level of a constitutional violation so long as the relevant areas of bias have been covered, trial courts can and should conduct voir dire proceedings in a way which not only meets constitutional requirements, but also enables litigants and their counsel to intelligently exercise peremptory challenges and which attempts, as much as possible, to eliminate bias and prejudice from the trial proceedings.

### C. Requested Jury Instructions

Defendant also claims that the trial court erred in refusing to submit two proposed jury instructions concerning circumstantial evidence and reasonable doubt to the jury. The first proposed instruction was a paragraph as to the law regarding circumstantial evidence which is susceptible to more than one reasonable interpretation.[63] The second instruction was a separate paragraph regarding reasonable doubt and the existence of alternative hypotheses other than guilt. These "two reasonable hypotheses" instructions were refused by the trial court, and another instruction on direct and circumstantial evidence was submitted. Defendant contends that he presented a reasonable hypothesis to explain the State's circumstantial evidence and that the requested instruction should have been given.

"An appeal challenging the refusal to give jury instructions presents questions of law only. Therefore, we grant no particular deference to the trial court's rulings."[64] The purpose of giving instructions to the jurors is to assist them in understanding issues which they have to decide in the case.[65] Included in a judge's duty to instruct the jury on the law applicable to the case is "the right of the defendant to have his theory of the case presented to the jury in a clear and understandable

---

**61.** *See, e.g., State v. Worthen,* 765 P.2d 839, 845 (Utah 1988); *State v. Bishop,* 753 P.2d 439, 448 (Utah 1988); *State v. Ball,* 685 P.2d 1055, 1060 (Utah 1984); *State v. Taylor,* 664 P.2d 439, 447 (Utah 1983).

**62.** *State v. Worthen,* 765 P.2d at 844–45 (quoting *State v. Taylor,* 664 P.2d at 447) (citations omitted).

**63.** The requested instruction was given except for the following paragraph:

> Also, if the circumstantial evidence is susceptible of two reasonable interpretations, either of which is as reasonable and likely as the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt. If on the other hand, after full and fair consideration and comparison of all of the evidence in this case, you can reasonably explain the fact in question on any reasonable grounds other than the guilt of the defendant, then you must acquit him.

**64.** *Ramon v. Farr,* 770 P.2d 131, 133 (Utah 1989).

**65.** *State v. Standiford,* 769 P.2d 254, 266 (Utah 1988); *State v. Potter,* 627 P.2d 75, 78 (Utah 1981).

way."[66] However, the trial court is not required to give any requested jury instruction if it does not comport with the facts presented or does not accurately state the applicable law.[67] Further, the trial court does not err in refusing to give a requested instruction if the point is properly covered in other instructions presented to the jury.[68]

 The instructions at issue are similar to the two reasonable hypotheses instructions requested by the defendant in *State v. Parsons.*[69] In addressing the necessity of giving an instruction on two reasonable hypotheses, this court stated:

> In *Larocco*, we held, "An instruction on reasonable alternative hypothesis is not required, even when the evidence is solely circumstantial." Thus, choosing not to give the instruction is squarely within the discretion of the court.
>
> . . . .
>
> The prosecution's burden of proof in *any* criminal case, whether the evidence be direct or circumstantial, or a combination of both, is that of beyond a reasonable doubt. The use of the reasonable alternative hypothesis instruction is merely one way of expressing that necessary burden of proof and there is no apparent reason to mandate that one, and only one, particular instruction be used by trial judges in conveying to the jury the meaning of that elusive phrase, "proof beyond a reasonable doubt." . . . In any event, the "reasonable doubt" instruction given in the instant case clearly and appropriately informed the jury of the legal standard to be applied.[70]

In the instant case, the requested instructions on reasonable alternative hypotheses were merely a more specific statement of the traditional requirement of proof beyond a reasonable doubt. The rea-

sonable doubt instruction given adequately covered any need for a reasonable hypothesis instruction, and to deny giving the further requested instructions was not erroneous.

In view of our disposition of the case, we decline to address other issues raised by defendant in his brief on appeal. We hereby reverse the trial court's denial of defendant's motion for new trial based upon newly discovered evidence and remand this case for further proceedings consistent with this opinion.

ZIMMERMAN, Justice (concurring):

I join in the grant of a new trial, and I concur in the opinion of the Chief Justice, except that portion that discusses the sufficiency of the evidence to support a verdict of guilty of first degree murder.

As I see the case, the only evidence that could support a finding of a knowing or intentional killing, the essential element of a first degree murder charge, is the testimony of Ronald Peterson, an inmate at the Utah State Prison, to the effect that defendant said he had killed his son and had gone out to the marina a day before the killing. Absent an advance trip to the site of the disposition of the corpse, all the evidence is equally consistent with an unplanned, accidental killing, and a finding of an intentional killing is nothing more than speculation.

Although we have ordered a new trial so that defendant can place before the jury evidence that Peterson fabricated his testimony in order to receive better treatment from the State, the majority seems to intimate that under our prior decisions, a first degree murder verdict could be upheld if the jury disbelieved Peterson's testimony,

66. *Potter,* 627 P.2d at 78.

67. *State v. Wilcox,* 28 Utah 2d 71, 498 P.2d 357, 359 (1972).

68. *State v. Miller,* 727 P.2d 203, 206 (Utah 1986); *State v. Larocco,* 665 P.2d 1272, 1273 (Utah 1983); *State v. Sessions,* 645 P.2d 643, 647 (Utah 1982).

69. 781 P.2d 1275 (Utah 1989).

70. *Id.* at 1285–86 (quoting *State v. Larocco,* 665 P.2d at 1273) (emphasis in original) (citation omitted).

something that may occur on retrial. I cannot join in that intimation.

STEWART and DURHAM, JJ., concur in the concurring opinion of ZIMMERMAN, J.

HOWE, Associate Chief Justice (concurring and dissenting):

I concur in the majority opinion except as to that portion of part II which holds that the trial court abused its discretion in denying defendant's motion for a new trial based on the allegation that Ronald Peterson testified falsely at defendant's trial. We held in *State v. Gellatly*, 22 Utah 2d 149, 153, 449 P.2d 993, 995–96 (1969), that before a new trial can be granted, the newly discovered evidence must be such as to render a different result *probable* on the retrial of the case. I cannot agree with the majority that "[w]ithout Peterson's testimony, ... it is probable that a reasonable jury would have had reasonable doubt as to whether defendant had the requisite intent to commit murder." Instead, I agree with the trial judge, who said:

> The defendant, in the Court's opinion, was not convicted on the testimony of Ronald Peterson. The defendant was convicted on an exceptionally strong circumstantial evidence case. Historically, circumstantial evidence has been as persuasive as direct evidence. The Court heard the testimony day after day after day, regarding the allegations against the defendant. The Court finds that the tests for newly discovered evidence relating to a new trial do not exist. Even if they did exist, the Court agrees totally and completely with the jury verdict rendered in this case, and is absolutely of the opinion that the outcome of this case would have not been any different whether Ron Peterson testified or not. For that, all of those reasons, and all of those findings, the Court denies the defendant's motion for a new trial.

The "exceptionally strong circumstantial evidence" which the trial judge referred to includes (1) the bruises and falls sustained by the baby while in defendant's care; (2) the insensitivity shown to the baby by defendant; (3) defendant's anger when questioned by police and his urging DeLeon not to give them certain information; (4) his jealousy of the baby; (5) his concern about the expense of raising the baby; (6) the fact that he was the last person to be with the baby prior to the baby's disappearance; (7) his elaborate explanation for the baby's disappearance; and (8) the baby's body found wrapped in a mattress cover which belonged to defendant. It is true that the State was never able to prove the exact means by which the child was killed, but that does not diminish the fact that "exceptionally strong circumstantial evidence" linked defendant to the baby's death.

In view of the circumstantial evidence, I cannot join the majority in ruling that the trial judge abused his discretion in not granting a new trial for "newly discovered evidence." Regardless of whether any judge of this court would have ruled differently, it is clear that the trial judge who observed the witnesses and heard their testimony day after day acted within the ambit of his discretion in concluding that the proffered testimony of Lisner would not have produced a different verdict. Our own cases hold that the refusal to grant a new trial based merely on new evidence of the lack of credibility of a witness will generally not be overturned on appeal. *See State v. Worthen*, 765 P.2d 839, 851 (Utah 1988), and cases cited therein. The trial judge properly assessed Lisner's proffer of testimony as resulting in "nothing more than a push and pull match between prisoners ... and that verbal tug of war could endure indefinitely." In light of the strong circumstantial evidence linking defendant to the crime, the testimony of a fellow prisoner either for or against defendant is pale by comparison. Peterson's testimony that defendant admitted killing the child and the proffered testimony of Lisner that Peterson admitted lying do not diminish the strong circumstantial evidence which still persists and which is sufficient to sustain the conviction.