UTAH DEPARTMENT OF ENVIRONMENTAL QUALITY and its executive director, Kenneth L. Alkema, Plaintiffs and Appellants,

v.

WIND RIVER PETROLEUM, Defendant and Appellee.

No. 930463.

Supreme Court of Utah.

Aug. 29, 1994.

---

Jan Graham, Atty. Gen., Leon A. Dever, Annina M. Mitchell, R. Douglas Credille, Asst. Attys. Gen., Salt Lake City, for plaintiffs.

Douglas J. Parry, Salt Lake City, for defendant.

DURHAM, Justice:

Plaintiffs Utah Department of Environmental Quality ("DEQ") and Kenneth L. Alkema, DEQ's executive director, appeal from a district court order denying DEQ's motion for summary judgment and granting summary judgment in favor of defendant Wind River Petroleum ("Wind River"). We vacate and remand for further proceedings.

This case arises under the Utah Hazardous Substances Mitigation Act (the "Act"), Utah Code Ann. §§ 19–6–301 to –325 (1991 & Supp.1993). In March 1989, a farmer in Vernal, Utah, reported that "an incredible amount of what looked like straight diesel" was draining through a culvert and onto his land. To protect his land and livestock, the farmer plugged the culvert, thus creating a petroleum-filled "pond" on the other side. Because petroleum is a statutorily defined

hazardous material, DEQ immediately investigated the situation. Shortly thereafter, DEQ began continual pumping to prevent the pond from overflowing onto other property and further damaging the environment.

Based on a variety of reports, including a site assessment from an engineering and environmental consulting firm, Alkema determined that a nearby property owned by Wind River was the source of the contamination.[1] Wind River had purchased the property in January 1988 and operated a Top Stop service station on the land.[2] Alkema further found that the petroleum release presented a direct and immediate threat to public health or the environment. *See* Utah Code Ann. § 19–6–309(1)(a).

In light of this threat, Alkema exercised his emergency powers under section 19–6–309 of the Act and ordered Wind River, as owner or operator of the Top Stop site, to abate the release. *Id.* § 19–6–309(1)(a)(i). Wind River responded with an intra-agency appeal, leading Alkema to conclude that the company was "unwilling or unable to take abatement action." *Id.* § 19–6–309(1)(b). Pursuant to sections 19–6–309(1)(b)(ii) and 19–6–309(2)(a), Alkema then authorized use of the Hazardous Substances Mitigation Fund (the "Fund") to finance the pumping and ongoing investigation.[3] In August 1990, after more information had been gathered, including a second site assessment by a second environmental consulting firm,[4] Alkema

again ordered Wind River to take abatement action, and Wind River again appealed. The record does not indicate whether Wind River pursued either intra-agency appeal.

Following Wind River's second appeal, Alkema again determined that Wind River was unwilling or unable to abate the petroleum release. Consequently, he reauthorized use of Fund monies to address the problem. DEQ used these funds to pump the petroleum-filled pond until July 1991, when it installed an oil/water separator on the Top Stop site. Following installation of the separator, the contamination ceased to spread but costs continued to accrue.[5]

In October 1991, DEQ filed an action under section 19–6–310 of the Act seeking reimbursement from Wind River for the costs of its Top Stop cleanup. Section 19–6–310 authorizes DEQ to recover the costs of any investigation and abatement performed under section 19–6–309 from a group of statutorily defined "responsible parties." *Id.* § 19–6–310(1). Section 19–6–310 also delineates the manner in which responsibility and liability must be apportioned among responsible parties. *Id.* § 19–6–310(2). Wind River denied that it had actively contributed to the release and thus disclaimed liability under section 19–6–310.

After some initial discovery, both parties moved for summary judgment. The district court ruled in favor of Wind River, finding that section 19–6–310 "apportions responsi-

---

**1.** The environmental consulting firm of Metcalf & Eddy concluded:

A definite release of petroleum hydrocarbons exists on [Wind River's] Top Stop property as evidenced by the presence of product found in one drive point near the gasoline islands. Since the apparent direction of the 8–in. clay subsurface drainage line passes through this affected area, it is probable that product in the clay drainage lines originates, or is contributed to, from the product saturated soils located near the Top Stop fuel islands since upgradient investigation has not located contamination from other sources.

**2.** The prior owner, Olympus Oil Company, also operated a service station on the property.

**3.** The pumping and investigation had originally been financed by the federal Leaking Underground Storage Tank Trust Fund. However, because DEQ's investigation located only above-

ground tanks, the federal assistance was withdrawn.

**4.** A source investigation conducted by the environmental risk management firm of Versar, Inc., stated:

From the analysis of previous studies, aerial photographs, interviews with local residents and regulatory officials and the results of the test pit excavations and analytical results, Versar has determined the free product contamination originates from the Top Stop property. Given the interviews and analytic results, it is believed that the diesel contamination is from an historic event. Further investigation of the site is required to determine the exact source within the Top Stop property.

**5.** As of November 1993, DEQ had spent $447,286.03 removing 22,435 gallons of trapped petroleum from the separator.

bility and liability for the costs and abatement of the release of a hazardous material among responsible parties in proportion to their respective contributions to the release." The court reasoned that Wind River was not liable for any investigation and abatement costs because DEQ had failed to prove that Wind River actively contributed to the release. DEQ appeals.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991). In reviewing the district court's ruling, we accept the facts and inferences in the light most favorable to the losing party. *Winegar*, 813 P.2d at 107. Because a challenge to summary judgment presents for review only questions of law, we accord no particular deference to the district court's conclusions but review them for correctness. *Schurtz v. BMW of N. Am., Inc.*, 814 P.2d 1108, 1111–12 (Utah 1991).

On appeal, DEQ challenges the district court's interpretation of section 19–6–310. DEQ asserts that the Act, like its federal counterpart, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), contemplates a strict liability standard. Thus, DEQ argues that Wind River, a statutorily defined "responsible party" by virtue of its owner or operator status, is strictly liable for Fund expenditures at the Top Stop site. DEQ concludes that regardless of whether Wind River actively contributed to the release and regardless of whether Wind River's petroleum tanks and lines leak, Wind River is strictly liable because it owns a piece of property that is releasing a hazardous material into the environment.[6]

Wind River, on the other hand, argues that the district court correctly construed section 19–6–310. Wind River claims that section 19–6–310, unlike CERCLA, apportions liabili-

ty to a responsible party only when that party actively contributed to the hazardous release. Thus, although admitting that "petroleum products are located under and adjacent to [its] property" and that these products are migrating "across and from" its property, Wind River argues that summary judgment was appropriate because DEQ did not demonstrate that Wind River affirmatively contributed to the problem. Indeed, Wind River asserts that (1) five tests administered by DEQ and Wind River established that Top Stop's petroleum tanks and lines do not leak, and (2) the contamination may have existed for thirty to forty years prior to Wind River's purchase of the Top Stop property. Wind River also points to numerous alternative potential sources of the release to support its theory that the petroleum was only "passively migrating" across or from its land.

## ANALYZING SECTION 19–6–310 OF THE ACT

This case requires the court to address a question of first impression. Does section 19–6–310 of the Utah Hazardous Substances Mitigation Act impose strict liability on responsible parties for the release of hazardous materials from their facilities? The proper construction of section 19–6–310 is a question of law. *State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993); *State v. James*, 819 P.2d 781, 796 (Utah 1991). Accordingly, we grant no particular deference to the district court's conclusions but review them for correctness. *Ward v. Richfield City*, 798 P.2d 757, 759 (Utah 1990).

When faced with a question of statutory construction, we look first to the plain language of the statute. *Larsen*, 865 P.2d at 1357; *Schurtz v. BMW of N. Am., Inc.*, 814 P.2d at 1112; *Bonham v. Morgan*, 788 P.2d 497, 500 (Utah 1989) (per curiam). Only when we find ambiguity in the plain language of the statute need we seek guidance from

---

6. DEQ also challenges the propriety of summary judgment on factual grounds. First, it claims that Wind River's motion for summary judgment was not supported by facts admissible in evidence, as required by rule 56(e) of the Utah Rules of Civil Procedure. Second, DEQ contends that summary judgment was inappropriate because a disputed issue of material fact remained as to whether a leak in Wind River's tanks or lines actively contributed to the release. Because today's decision resolves the dispute as a matter of law on statutory grounds, we need not reach these arguments.

the legislative history and relevant policy considerations. *Schurtz*, 814 P.2d at 1112; *Bonham*, 788 P.2d at 500. Section 19–6–310 states in pertinent part:

(1) The executive director may recover costs of any investigation and abatement performed under Section 19–6–309 and this section from responsible parties.[7]

(2)(a) In apportioning responsibility for the investigation and abatement, or liability for the costs of the investigation and abatement, in any administrative proceeding or judicial action, the following standards apply:

(i) liability shall be apportioned among responsible parties in proportion to their respective contributions to the release; and

(ii) the apportionment of liability shall be based on equitable factors, including the quantity, mobility, persistence, and toxicity of hazardous materials contributed by a responsible party, and the comparative behavior of a responsible party in contributing to the release, relative to other responsible parties.

(b)(i) The burden of proving proportionate contribution shall be borne by each responsible party.

(ii) If a responsible party does not prove his proportionate contribution, the court or the executive director shall apportion liability to the party based on available evidence and the standards of Subsection (a).

(c) The court may not impose joint and several liability.

(d) Each responsible party is strictly liable for his share of investigation and abatement costs.

(3) The failure of the executive director to name all responsible parties is not a defense to an action under this section.

(4)(a) Any party who incurs costs under Section 19–6–309 and this section in excess of his liability may seek contribution from any other party who is or may be liable

under Section 19–6–309 and this section for the excess costs in the district court.

(b) In resolving claims made under Subsection (a), the court shall allocate costs using the standards set forth in Subsection (2).

Utah Code Ann. § 19–6–310.

We hold, based on the plain language of section 19–6–310, that the statute establishes a two-part liability standard. The first part, described in section 19–6–310(1), holds responsible parties *strictly liable* for the costs of any investigation and abatement performed pursuant to the emergency provisions of section 19–6–309. The second part, described in section 19–6–310(2), apportions responsibility and liability *among multiple responsible parties* using a fault-based standard. In the context of multiple responsible parties, each bears the burden of proving its proportionate contribution. *Id.* § 19–6–310(2)(b)(i).

It is quite clear from the definitional section of the statute that fault is not a basic premise of liability under the Act. Those "responsible" under the Act are

(i) the owner or operator of a facility;

(ii) any person who, at the time any hazardous substance was disposed of at the facility, owned or operated the facility;

(iii) any person who arranged for disposal or treatment, or arranged with a transporter for transport, for disposal, or treatment of hazardous materials or substances owned or possessed by the person, at any facility owned or operated by another person and containing the hazardous materials or substances; or

(iv) any person who accepts or accepted any hazardous materials or substances for transport to a facility selected by that person from which there is a release that causes the incurrence of response costs.

*Id.* § 19–6–302(18)(a). The drafters of the Act specifically excluded common or contract carriers (for delivering the hazardous materials or substances and for "releases" beyond their control) and persons whose ownership

---

7. "Responsible party" is defined in section 19–6–302(18)(a)(i) as, among other things, "the owner or operator of a facility."

interest in a facility is attenuated, as in security holders and fiduciaries. *Id.* § 19–6–302(18)(b)–(c). Thus, section 19–6–302(18)(b) and (c) demonstrates that the drafters knew how to exclude potentially liable parties on the basis of fault and explicitly declined to do so for those listed in section 19–6–302(18)(a).

We understand the statute to operate as follows: If, as in the instant case, DEQ has named only one responsible party, that party is completely liable for DEQ's costs, regardless of fault.[8] Furthermore, that named party bears the implicit statutory burden of taking the analysis to the second level, where liability can be apportioned. That is, a responsible party held strictly liable under section 19–6–310(1) bears the burden of locating and joining other responsible parties as co-defendants. If that responsible party refuses to accept or fails to meet that burden, it remains strictly liable for the entire amount of DEQ's expenses. Simply put, DEQ's obligations end once it has demonstrated that a named defendant is a responsible party within the meaning of the Act.

Section 19–6–310 provides support for this conclusion. Section 19–6–310(3) states, "The failure of the executive director to name all responsible parties is not a defense to an action under this section." *Id.* § 19–6–310(3). Thus, having located a single responsible party, DEQ need not pursue others.[9] If a named defendant believes other responsible parties exist, that defendant must locate and join them as co-defendants. Similarly, section 19–6–310(4) establishes that responsible parties who incur costs in excess of their liability may seek contribution from other parties who are or may be liable for those excess costs. *Id.* § 19–6–310(4). Section 19–6–310(4), therefore, clearly places the burden on named defendants to seek out other responsible parties and demand contribution from them.

In addition, the emergency provisions of section 19–6–309 further persuade us that section 19–6–310 contemplates a strict liability standard. Section 19–6–309 states in pertinent part:

> (1)(a) If the executive director has reason to believe any hazardous materials release that occurred after March 18, 1985, is presenting a direct and immediate threat to public health or the environment, the executive director may:
>
> (i) issue an order requiring the owner or operator of the facility to take abatement action within the time specified in the order; or
>
> (ii) bring suit on behalf of the state in the district court to require the owner or operator to take immediate abatement action.
>
> (b) If the executive director determines the owner or operator cannot be located or

---

**8.** We note that this construction does not amount to imposing joint and several liability in violation of section 19–6–310(2)(c). The statute's joint and several liability provision applies only when DEQ has identified more than one responsible party in a lawsuit or when a named defendant has located and joined other responsible parties as co-defendants. It thus has no application when only one responsible party has been identified.

**9.** Justice Howe's concurring and dissenting opinion takes issue with the majority opinion on this point. Justice Howe states that he "would not want to leave the impression that DEQ could blindly bring its action for reimbursement against a single responsible party and ignore others, leaving it to the defendant to prove the liability of others." His position, however, ignores the fact that the Act expressly authorizes DEQ to do precisely what he warns against, at least with respect to owners and operators. Section 19–6–309 provides in pertinent part:

> (1)(a) If the executive director has reason to believe any hazardous materials release that

occurred after March 18, 1985, is presenting a direct and immediate threat to public health or the environment, the executive director may:

> (i) issue an order *requiring the owner or operator* of the facility to take abatement action within the time specified in the order; or
>
> (ii) bring suit on behalf of the state in the district court *to require the owner or operator* to take immediate abatement action.

*Id.* § 19–6–309 (emphasis added). Section 19–6–309 authorizes DEQ to order the owner or operator of a facility to take abatement action. The provision places no further burden on DEQ to locate other responsible parties. Justice Howe has failed to articulate a reason why DEQ may simply name the owner or operator under section 19–6–309 but must locate other responsible parties under section 19–6–310. Indeed, DEQ need expend Fund monies and invoke section 19–6–310's reimbursement provisions only after the owner or operator has proven unwilling or unable to take abatement action. *See id.* § 19–6–309(b).

is unwilling or unable to take abatement action, the executive director may:

> ...;
>
> (ii) use fund monies to investigate the release and take abatement action.

*Id.* § 19–6–309(1). Because section 19–6–309(1) authorizes DEQ's executive director to compel the owner or operator of a facility to undertake abatement action and thereby absorb all subsequent costs, we believe it follows that 19–6–310(1) contemplates a strict liability standard. DEQ need only resort to the Fund and a reimbursement lawsuit under section 19–6–310 when its section 19–6–309 abatement order has been ignored. Thus, if section 19–6–309 permits DEQ to force the owner or operator of a facility to abate the release itself, section 19–6–310(1) must similarly permit DEQ to hold that owner or operator strictly liable for Fund expenditures.

## APPLYING SECTION 19–6–310 OF THE ACT

Under this construction of section 19–6–310, the instant case is easily resolved. Section 19–6–310 authorizes DEQ's executive director to "recover costs of any investigation and abatement performed under Section 19–6–309 and this section from *responsible parties.*" Utah Code Ann. § 19–6–310(1) (emphasis added). The Act defines a responsible party as, inter alia, the *"owner or operator* of a *facility."* *Id.* § 19–6–302(18)(a) (emphasis

added). A "facility" is defined as "any site or area where a hazardous material or substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *Id.* § 19–6–302(5)(a)(ii). A "'release' means a spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of substances into the environment that is not authorized under state or federal law, rule, or regulation." *Id.* § 19–6–302(14)(a).

Bearing the above provisions and definitions in mind, we turn to the undisputed facts of the case. Wind River is the owner or operator of the Top Stop site. Petroleum products are located under and adjacent to the Top Stop property, and DEQ, based upon the investigations of two environmental consulting firms, determined that the contamination originated on the Top Stop property. Indeed, the Top Stop fuel islands are surrounded by "product saturated soils." Petroleum is a hazardous material. This petroleum product is escaping from the Top Stop property. Thus, the Top Stop site is a facility, *see id.* § 19–6–302(5)(a)(ii), which is "releasing" a hazardous material, *see id.* § 19–6–302(14)(a). Wind River, therefore, is the owner or operator of a facility which is releasing a hazardous material into the environment.[10]

Given our construction of section 19–6–310(1), Wind River is strictly liable as a responsible party for the investigation and

---

10. We note that Justice Howe's concurring and dissenting opinion misinterprets the legislature's strict liability scheme. Justice Howe states, "It is my view that liability under the Act is not imposed on a landowner through whose property petroleum simply migrates from a higher source and whose property makes no contribution to the contamination as it passes through." Justice Howe's position misses two important points. First, the Act contains no requirement that DEQ pursue only those responsible parties connected with the source of a hazardous release. The Act broadly defines "facility" as "any site or area where a hazardous material or substance has been deposited, stored, disposed of, or placed, *or otherwise come to be located." Id.* § 19–6–302(5)(a)(ii) (emphasis added). Petroleum which passively migrates from an upgradient source to a downgradient site or area has "otherwise come to be located" on that downgradient facility. Second, the Act unequivocally imposes strict liability on an owner or operator of a facility from

which there is a release, *without regard to causation.*

> While we are sympathetic to Justice Howe's concerns, they simply do not appear to be addressed by the Act in its current form. Should the legislature wish to carve out an exception for "innocent" purchasers or downgradient landowners, it certainly is free to do so. In any event, as a practical matter it appears highly unlikely that DEQ would ever pursue a downgradient facility while ignoring an upgradient source. Arguably, such conduct would be inconsistent with the statute's purpose. Under section 19–6–309, DEQ is authorized to redress direct and immediate threats to public health or the environment. That purpose would not be served by forcing the downgradient recipient of passively migrating petroleum to clean up his or her land while the upgradient source continued to release hazardous materials into the environment.

abatement costs arising from DEQ's emergency measures at the Top Stop facility. However, our construction of the statute also affords Wind River the opportunity to locate and join other responsible parties as co-defendants. If Wind River successfully takes advantage of this opportunity on remand, the district court shall apportion liability among the co-defendants pursuant to section 19–6–310(2). If Wind River is unwilling or unable to identify other responsible parties, the district court shall enter judgment against Wind River for the entire amount of DEQ's Top Stop operation.[11]

Based on the foregoing, we vacate the district court's grant of summary judgment in favor of Wind River and remand for further proceedings consistent with this opinion.

ZIMMERMAN, C.J., and RUSSON, J., concur.

HOWE, Justice, concurring and dissenting:

I concur in the majority's construction of the Act, subject to the reservations and observations which follow. I concur in remanding the case to the trial court, but I would direct that court to make the factual determination whether the petroleum which is being released originates from the Top Stop property, as DEQ contends, or whether it originates from an upgradient source and simply migrates through the Top Stop property to the pond below, as Wind River asserts. I think it is improper for this court to make that factual determination in the first instance. That determination escaped being made by the trial court because of the court's construction of the Act that Wind River could not be liable because there was no evidence that since it purchased the property in January 1988, it had done anything to contribute to the contamination. We have disagreed with that interpretation of the Act, but that now leaves the above factual determination to be made.

DEQ, relying on two studies made for it, maintains that petroleum is escaping from the Top Stop property. Wind River does not dispute that fact but asserts that the petroleum might originate from an upgradient source and that it simply migrates through its property to a lower point off its property. It is my view that liability under the Act is not imposed on a landowner through whose property petroleum simply migrates from a higher source and whose property makes no contribution to the contamination as it passes through. Such property would not be a "facility" under section 19–6–302(5)(a)(ii), which defines "facility" as "any site or area where a hazardous material or substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." Petroleum migrating from a higher source through a landowner's property to a lower point off the property but whose property makes no contribution to the contamination would not be a "facility" because the petroleum is not "deposited, stored, disposed of, or placed, or otherwise come to be located" on the property.

Wind River should be given the opportunity on remand to prove that it is just such an innocent landowner and to rebut and impeach the reports and studies relied upon by DEQ. We recently observed in *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 928 (Utah 1993):

> Affidavits and depositions submitted in support of and in opposition to a motion for summary judgment may be used only to determine whether a material issue of fact exists, not to determine whether one party's case is less persuasive than another's or is not likely to succeed on the merits.

In short, Wind River is entitled to an evidentiary hearing and should not be deprived of that right by our making a factual determination on an issue which the trial court did not confront and rule on.

Additionally, I wish to express a caveat to a statement made in the majority opinion:

> Wind River's proposed construction might also force "innocent" parties, such as state taxpayers, to bear undeserved cleanup costs. Making the policy choices about where that burden should fall is properly a legislative function.

---

**11.** Admittedly, the legislature's strict liability scheme will sometimes produce harsh results, especially when an owner or operator is entirely without fault and the real wrongdoers cannot be brought into the proceeding. On the other hand,

"Thus, having located a single responsible party, DEQ need not pursue others." I believe that it is the intent of the Act that DEQ should bring its action against and seek reimbursement from all parties whose land in any way contributes to the contaminated release. While it is true that the failure to name all responsible parties is not a defense to the action, it would place a heavy financial burden on a landowner to be singled out and made to bear the burden of ascertaining who else may be liable. I would not want to leave the impression that DEQ could blindly bring its action for reimbursement against a single responsible party and ignore others, leaving it to the defendant to prove the liability of others. In the instant case, it does not appear that DEQ has done that since its studies and reports indicate that the contamination originates on the Top Stop property and no other land contributes to the contamination.

STEWART, Associate C.J., concurs in the concurring and dissenting opinion of HOWE, J.