**V–1 OIL COMPANY, Petitioner,**

v.

**DIVISION OF ENVIRONMENTAL RESPONSE AND REMEDIATION, DEPARTMENT OF ENVIRONMENTAL QUALITY; and the State of Utah, Respondents.**

No. 970315–CA.

Court of Appeals of Utah.

July 9, 1998.

Peter Stirba and Linette B. Hutton, Salt Lake City, for Petitioner.

Jan Graham and Melissa M. Hubbell, Salt Lake City, for Respondents.

Before WILKINS, Associate P.J., and BENCH and GREENWOOD, JJ.

OPINION

BENCH, Judge:

V–1 Oil Company (V–1) appeals from the final order issued by the Department of Environmental Quality's Solid and Hazardous Waste Control Board (the Board). We affirm.

BACKGROUND

On Friday, January 12, 1996, A & A General Contractors (A & A) complained to Salt Lake City Public Utilities (SLCPU) about odors and vapors in the A & A building located on Whitney Avenue in Salt Lake City. SLCPU responded and found the source of the odor in a nearby sewer line running east-west on Whitney Avenue. Upon examining the sewer, SLCPU discovered a "gasoline or oil substance" on the surface of the water in the sewer line. SLCPU flushed the sewer line in an attempt to alleviate the problem. At the beginning of the next week, A & A complained again about the strong odor inside its building. SLCPU again responded by flushing the sewer line to prevent the build up of fumes in the sewer and the A & A building. SLCPU also made a video of the inside of the sewer, which showed petroleum entering and flowing through the sewer. On January 16, 1996, SLCPU reported the gasoline in the sewer to the Division of Environmental Response and Remediation (DERR) and asked it to help find the source of the contamination. To alleviate the threat to public health, SLCPU, and later DERR, continually flushed water through the sewer line until June 1996.

When investigating the source of the sewer contamination, DERR noted that the only underground storage tank (UST) facility in the area was on the V–1 property about 200 feet from the sewer line. DERR relied upon regional groundwater flow maps showing the V–1 station to be up-gradient from the point at which the contamination entered the sewer. DERR records indicated numerous reports of releases and/or leaks at the V–1 facility that had not been remediated. DERR records also revealed that during the previous month, V–1 had removed two old USTs from the facility. One tank had holes in it, and both contained some level of gasoline and water. These tanks had contaminated the immediate area with petroleum. Additionally, during that same month, V–1 reported a confirmed petroleum release at the facility.

Based upon the above information, DERR reports, and the SLCPU video of the contamination in the sewer, the Board's executive secretary issued an Emergency Order to V–1, asserting that V–1 was a responsible party. In accordance with the Utah Underground Storage Tank Act (the Act), Utah Code Ann. §§ 19–6–401 to –429 (1995 and Supp.1997), and Utah Admin. Code R311–202, this order required V–1 to immediately investigate, abate, and take corrective action to alleviate the flow of free product petroleum into the sewer.

Upon receiving the executive secretary's order, V–1 retained a consultant, TriTechnics Corporation, to determine whether V–1 was the source of the free product petroleum entering the sewer on Whitney Avenue. Although V–1 submitted the consultant's report to DERR, the report did not outline any plan to alleviate the impact of the petroleum contamination as required in the Emergency Order. In its report to V–1, the consultant recommended on-site and off-site abatement actions. However, V–1 never authorized or performed any abatement. Because V–1 did not comply with the Emergency Order to take abatement action, petroleum continued to flow into the sewer. Therefore, on January 25, 1996, in accordance with Utah Code Ann. § 19–6–420(2)(b) (1995), the executive secretary issued a Notice of Noncompliance

to V–1. The Notice of Noncompliance advised V–1 that due to its refusal to take abatement action in the face of the imminent, direct, and substantial threat to the public health and environment, DERR would use public money, which it may recover from V–1, to commence abatement and corrective action.

On receiving the Notice of Noncompliance, V–1 filed a request for agency review and asked the Board to dismiss the Emergency Order and Notice of Noncompliance. After holding a formal hearing, the Board upheld the Emergency Order and Notice of Noncompliance. V–1 now asks this court to review the Board's decision.

## STANDARD OF REVIEW

On appeal, V–1 argues that competent evidence does not support the Board's factual findings. We review the Board's findings of fact in accordance with the Utah Administrative Procedures Act and will reverse only if the findings made by an administrative agency are "not supported by substantial evidence when viewed in light of the whole record before the court." Utah Code Ann. § 63–46b–16(4)(g) (1993); *Commercial Carriers v. Industrial Comm'n*, 888 P.2d 707, 710 (Utah Ct.App.1994). " 'Substantial evidence' is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank of Boston v. County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990). On review, however, we defer to the Board's assessment of conflicting evidence and "this court will not substitute its judgment as between two reasonable conflicting views, even though we may have come to a different conclusion had the case come before us for de novo review." *Grace Drilling Co. v. Board of Review*, 776 P.2d 63, 68 (Utah Ct.App.1989). "It is the province of the Board, not appellate courts, to resolve conflicting evidence, and where inconsistent inferences can be drawn from the same evidence, it is for the Board to draw the inferences." *Id.*

## ANALYSIS

V–1 contends that the Board erred in upholding the Emergency Order and Notice of Noncompliance issued by the executive sec-

retary. Specifically, V–1 argues that the Board's finding that V–1 was a source of the petroleum contamination, and therefore a responsible party under the Act, was not supported by substantial evidence when viewed in light of the entire record.[1]

The record contains the following evidence supporting the Board's finding that V–1 was a source of the petroleum impacting the sewer: (1) DERR testimony and records showing that V–1 is the only nearby UST site still in use; (2) V–1 is approximately 200 feet from the point at which the petroleum was entering the sewer; (3) regional groundwater flow maps show that V–1 is up-gradient from the impacted sewer line; (4) DERR testimony and records showing a history of petroleum releases on the V–1 property; (5) testimony from the V–1 station manager that V–1 reported a line leak and experienced petroleum inventory shortages totaling approximately 2,298 gallons in the last three months of 1995; and (6) testimony from DERR that although V–1 did investigate as required under the Emergency Order, it failed to fully comply with the order because it refused to do any on-site or off-site abatement.

The evidence contained in the record that is inconsistent with the Board's findings includes: (1) testimony from the V–1 consultant that the groundwater gradient on the V–1 property was to the northeast rather than northwest as the groundwater flow maps indicated; and (2) the V–1 consultant's testimony and investigative assessment that the petroleum in the sewer did not result from V–1's most recent leaks or inventory losses because petroleum could not migrate that quickly.

"[W]hen viewed in light of the whole record before the court" under section 63–46b–16(4)(g), we conclude that substantial evidence supports the Board's findings. The relevant evidence before the Board adequately supports the conclusion that V–1 was a source of the petroleum found in the sewer along Whitney Avenue. Therefore, the Board did not err in upholding the Emergency Order and Notice of Noncompliance issued to V–1.

We have considered the other issues raised by the parties and determine that they are without merit. *See State v. Carter*, 776 P.2d 886, 888–89 (Utah .1989) (stating appellate courts need not address meritless issues).

For the reasons stated above, we affirm the Board's order upholding the executive secretary's Emergency Order and Notice of Noncompliance.

WILKINS, Associate P.J., and GREENWOOD, J., concur.

---

1. V–1 argues that it cannot be required to abate and take corrective action of an off-site contamination before a determination that it is responsible for the condition. However, the Act defines a responsible party as "the owner or operator of a facility." Utah Code Ann. § 19–6–402(26)(a)(i) (Supp.1997). The Act defines facility as "all underground storage tanks located on a single parcel of property...." *Id.* § 19–6–402(14). A release is defined as "any spilling, leaking, emitting, discharging, escaping, leaching, or disposing from an underground storage tank or petroleum storage tank." *Id.* § 19–6–402(25). Under the plain language of the definitions contained in the Act, V–1 is a responsible party if it is the owner of a UST facility or has experienced releases. Although V–1 may not be *the only* responsible party, it is liable for the abatement if it is at least *a* responsible party under the Act. Cf. *DEQ v. Wind River Petroleum*, 881 P.2d 869, 873 (Utah 1994) (holding Utah Hazardous Substances Mitigation Act, Utah Code Ann. §§ 19–6–301 to –325 (1991 and Supp.1993), imposes strict liability on owner or operator of facility as responsible party).